## 49110. In re LEVI.

Deen, Judge.

1. Code Ann. § 24A-3201 (a) provides: "The court by order may terminate the parental rights of a parent with respect to his child if: . . . (2) the child is a deprived child and the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm." On a petition brought by the Fulton County Department of Family and Children Services seeking termination of parental rights in order to pave the way for adoption of a 16-month-old infant, the juvenile court judge stated at the commencement of the hearing that the only area in which he granted such relief was when "deprivation is due to physical impairment due to some physical retardation. . . and I don't know legally whether I can grant the order prayed for." After hearing the evidence the judge also stated, "As I understand the law, the question in issue in relation to the law is does the evidence sustain a finding that deprivation in this can be expected to continue, or will continue." He then dismissed the petition with prejudice holding that "as a matter of law the evidence is insufficient to justify a termination of all parental right." From this it is obvious that the judge felt the quantum of evidence before him was insufficient as a matter of law to invoke any grounds for separation or any exercise of his discretion in the

consideration of the child's welfare.

2. The mother of the infant whose parental rights are sought to be terminated testified freely at the hearing. From her, her probation officer, and case workers, it appeared that she came from a broken home and was raised in state institutions in Arizona and Ohio; she ran away from the latter at least once and from the former some 13 times; at the age of fourteen she left permanently. When four or five months pregnant she married a man she had met subsequent to the pregnancy but lived with him only 10 days. She was admitted to Grady Hospital for psychiatric care and diagnosed as having contracted hepatitis, vaginal disease and heroin addiction. The baby was born at Grady shortly thereafter, and was diagnosed as premature and suffering from symptoms of heroin withdrawal because of the prenatal condition of the mother. The mother was at this time about 15 years of age and admitted to having been on heroin for three years. She falsified her age and, according to her testimony at this hearing, falsified the name of the natural father; she now says the father is a man presently in a penitentiary in Florida, with whom she was arrested and charged with receiving stolen property. She left Grady Hospital soon after the birth without seeing the child. She came back after a period of time and took it away, stayed in some man's apartment for a week or so, left following a fight; engaged a friend as babysitter but did not return at the appointed time and the infant was eventually taken by ambulance to the hospital in an emergency condition.

A hearing was had before a referee following complaint by the Atlanta Police Department; the mother apparently persuaded the referee to return the baby (aged 7 weeks) but again left it with a male acquaintance that same evening and did not return for some time. She was also arrested and pleaded guilty to possession of heroin, and, representing herself as an adult by means of false identification, was given a three-year sentence to be probated at the end of eight months. On October 10, 1972, in a hearing to which she interposed no objections, the infant was adjudicated a deprived child and placed in agency custody for a minimum period of two years. It

has since then been in four foster homes. Its present foster parents have had it for some six months and wish to adopt it. The foster father testified that when they took the child at ten months it weighed 13 pounds and could not hold a bottle; that at 16 months it weighs 23 pounds, is normal, walking, healthy, and learning to talk. At this point in the hearing the following colloquy took place: "Mother: You said he didn't weigh but 13 pounds and couldn't hardly hold his bottle, did the doctor tell you why he was like that? A. I have got a letter from that doctor. Lack of stimulation during the first ten months of life. Q. What does that mean?"

After eight months the mother was released on probation and placed in Renewal House, apparently for guidance and/or drug abuse treatment. She immediately demanded to see the infant; on being told that this would be arranged but would take two weeks she quarreled with the county officer, left Renewal House, and made no further effort to see the baby or to report to the probation officer. When located she had been arrested on a charge of armed robbery and aggravated assault growing out of an incident apparently involving drugs. She also had an arrest in another city for prostitution. The probation officer testified that the mother denied the particular charge on which she was arrested but did admit drug thefts from various drug stores to sustain her heroin habit; also that she exhibited the same pattern of promises and vague plans for the future which she had shown throughout, and which she had never attempted to actualize.

Another informed witness gave opinion testimony concerning the unlikelihood of any change in the mother's behavior pattern, and stated that where a family does not rehabilitate itself and retrieve a child from a foster home within 18 months the likelihood is that it will remain there to be raised by the county, and "we consider this a pathogenic condition; it's not a healthy environment to grow up in because he is not a permanent member of a family. . . [it is] a limbo status"; that over half of the children in foster care are disturbed; that the best age for adoption is six months or less, and that after six months the chances of adoption steadily

decrease. There was also evidence that the foster parents had had the child in their custody for six months prior to the hearing (the date of which was November, 1973) wished to adopt it, and were considered fit and proper parents.

3. There is no doubt but that the juvenile court judge was deeply conscious of the conflicting priorities which this state of facts set before him, but that his decision was based on the premise that he did not have, or would not use, judicial discretion to terminate parental rights except in cases of absolute *physical* disability. We disagree. This woman was, in all probability, from the evidence presented, and still is a heroin addict and became involved in drugs at the age of 12 or 13; after serving seven months of her original sentence her one attempt to see the child ended in a tantrum when her wishes were delayed for a period of days and she apparently then let several months pass without further effort, in the meantime violating her probation and suffering arrest for other extremely serious and drug-related crimes. While she attempted to explain away these and other facts, including failure to make any attempt to work or to go back to school, her own statements show that she does not deny the basic circumstances out of which the charges arose. We thus have a tragic picture of a woman, herself institutionally reared, for whom drugs and crime may have already become the end product of existence. Under the testimony given her rehabilitation is likely to be a slow and painful process; it may be effected, and her youth gives promise that if it is, her possibilities of family life and child rearing, if this is what she wants, may yet be good. On the other hand, the infant's situation is critical. If its disposition is to be delayed through lengthy institutional and foster care the chances of history repeating itself are infinitely multiplied. During its first eighteen months of life the mother has had it less than one, and has on each occasion of custody casually left it in the hands of strangers. This comports with the behavior of this pathogenic type of personality. "From hospitals, prisons, and long-term drug rehabilitation programs, they voiced the dream of a reconstituted

family which had never really existed. Returning from long periods of absence, this theme persisted among them while their progeny remained in long-term placement." Nichtern, The Children of Drug Users, 12 Journal of the American Academy of Child Psychiatry 24, 30-31.

The Act (Ga. L. 1971, p. 709 et seq.) is to be liberally construed toward the protection of the child whose well-being is threatened. Code Ann. § 24A-101. Deprivation of love and nurture is equally as serious as mental or physical disability. Goldstein, Freud & Solnit, Beyond the Best Interests of the Child, 32-34. "A termination hearing seeks above all else the welfare of the child, with due regard for the rights of the natural and adoptive parents. [The judge] will realize that the natural parents must be cautioned, informed, counseled, and protected; he will realize that the adoptive parents must likewise be protected, that their reliances and expectations should be strongly considered. And, after considering the interests of these parties, when the judge is faced with the final decision in an adoption [or termination] case, he will ponder again that ancient question, 'Is it well with the child?' " Katz, Judicial and Statutory Trends in the Law of Adoption, 51 Georgetown Law Journal, 64, 69, 95.

This case is far different from *Meyers v. State of Ga.,* 124 Ga. App. 146 (183 SE2d 42). There the sole issue was abandonment, and the sole act, repented of within a few days, was committed on the day of the infant's birth in an effort to hide the pregnancy from the mother's parents and her employer. Both the mother and her family were otherwise stable and competent. It is also far different from *Bennett v. Clemens,* 230 Ga. 317 (196 SE2d 842) where, as pointed out by Justice Gunter in his dissent, although the child had been temporarily left in a commune setting she was well cared for physically and emotionally, and with "a lot of people loving her." There is also a vast difference between the sporadic smoking of marijuana in the *Bennett* case and the heroin addition in this one. The evidence demands a finding that the denial of the petition in this case is unwarranted. Under the circumstances appearing in this record the parental relationship should be severed. We accordingly reverse without remand for the reason that nothing could be

affirmatively accomplished by remand for another hearing.

*Judgment reversed. Stolz, J., concurs. Hall, P. J., concurs specially.*

ARGUED FEBRUARY 12, 1974 — DECIDED MARCH 15, 1974.

*Walter M. Henritze, Jr., Lucy S. McGough,* for appellant.

*Arthur K. Bolton, Attorney General, Timothy J. Sweeney, Dorothy Y. Kirkley, Assistant Attorneys General,* contra.

HALL, Presiding Judge, concurring specially.

I concur in the reversal of the judgment in this case for the reason that the trial judge proceeded under an erroneous theory of law (that he had no discretion in the matter). Where this occurs, the case should be reversed and remanded to the trial judge to exercise his discretion. The appellant's attorney agreed on oral argument that this is the proper procedure.