### 55456. LEYVA v. BROOKS et al.

WEBB, Judge.
Barbara Kay Christley Leyva, the natural mother of two minor children, appeals from an order of the Juvenile Court of Fayette County permanently terminating her parental rights and awarding temporary custody to the Fayette County Department of Children and Services.

At the hearing culminating in the termination order the following history of the case emerged. Mrs. Leyva, who is deaf and mute, first met the appellees, Mr. and Mrs. James Brooks in Daytona Beach, Florida in 1971. Mrs. Leyva was working for Mr. Brooks' stepfather as a peddler, which is not an uncommon vocation for deaf-mutes, selling trinkets in public places. Mrs. Leyva

at that time was married to Kelley Christley and the family residence was in North Carolina. When she returned from Florida she discovered that her husband had turned the children over to a welfare agency. She retained a lawyer, went to court and regained custody of the children. Because Christley not only had neglected the children but also had been abusing her, she came to Georgia in June of 1971 "to get a fast divorce." Peddling was the only gainful activity that she knew, and in order to keep her husband away from the children she made an agreement with the Brooks' to provide child care for $25 a week while she worked.

Receipts introduced in evidence show that Mrs. Leyva paid a total of $831 over an eight-month period beginning June 14, 1971. That amount covered child care through the end of January 1972, although temporary custody of the children was awarded to the Brooks on January 12, thus ending her financial obligation. Mrs. Leyva testified that she stopped paying on the advice of friends with whom she was staying in Statesville, North Carolina. The Brooks did not ask for further financial help because they did not need it and they claimed not to "know where she was after that."[1]

Mrs. Leyva had retained an attorney to file her petition for divorce and child custody. Prior to the final hearing the Brooks engaged the same attorney to seek permanent custody of the children in their behalf. Despite the obvious conflict of interest[2] he immediately began legal procedures necessary to irrevocably sever all ties of Mrs. Leyva to her children, and on October 4, 1971, the Juvenile Court of Fayette County issued a show cause order granting temporary custody to the Brooks and setting a date for a hearing on termination of Mrs. Leyva's

---

[1] The record shows, however, that Mrs. Leyva saw the Brooks in 1974 and that the Brooks were able to provide her address to their attorney in 1977.

[2] At oral argument, present counsel for Mrs. Leyva responded in answer to a question from the bench that the unethical conduct involved here had been reported to the Disciplinary Board of the State Bar.

parental rights.

Although Mrs. Leyva signed an acknowledgment of service it is clear from the evidence that she had absolutely no understanding of what she was doing. She did not read or write very well and characterized herself as "very green" and immature at the time. She did not know the difference between custody and adoption, the Brooks did not explain it to her, and she never agreed to let them adopt her children but only wanted to keep them away from Christley. She was urged, moreover, by her employer (James Brooks' stepfather), and by the Brooks, who were also present, to sign the acknowledgment and was told it would help keep her husband away.

Between January 1972 and April 1974 Mrs. Leyva was forced to travel extensively in order to support herself by peddling. She met Leonel Leyva, her present husband who also is deaf, in June, 1974, and they were married the following January 31. Two months later they escaped from their peddler boss and began setting up a life of their own.

In March, 1976, the Leyvas moved to Clarkston, Washington, where they now have a home for themselves and their three children, who are hearing and speaking. He is presently employed in a restaurant and learning to read and write. His employer states that Mr. Leyva, a Mexican alien who desires to become a U. S. citizen, is "one of the finest employees" he has ever had; that "his duties are varied and he does everything that is necessary very well"; that the other employees enjoy working with him "because of his efficiency, enthusiasm and his dynamic personality"; that he has made Mr. Leyva a permanent job offer; and that he has no trouble communicating with him and is now learning sign language. Many other friends and acquaintances submitted depositons speaking in glowing terms of the Leyvas' stable and happy home life, their love and care for their children and the adequate financial, education and employment arrangements they have made in spite of all their handicaps.[3]

---

[3] Al Johnson of the Idaho State Department of Health and Welfare stated: "I feel Mrs. Leyva's housekeeping

Mrs. Leyva has become so skilled at budgeting her husband's salary that they had over $2,000 in a savings account, and are planning to add to their mobile home another bedroom for the Christley children. There is special equipment in the home to compensate for the Leyvas' deafness and Mrs. Leyva can use her voice to get her children's attention. She is teaching the oldest child sign language and he in turn communicates with the younger children both orally and in sign language. An interpreter comes to the home each week to facilitate the learning process.

In addition to the difficulty in maintaining contact with her children since 1972 because of her poverty, the distance, changing addresses and physical handicaps, the Brooks never encouraged such contacts or visits. Mr. Brooks told the children that if their mother came and got them, he "wouldn't know how she'd treat'em or what she'd do to 'em and all." He assured the children "nobody going to get'em until the Court said so."

The court concluded from the above facts that while Mrs. Leyva did not legally abandon her children because an order of temporary custody had been issued, she did in fact abandon them "as she made only a few attempts in the first year to contact or see them and made no attempts after that until a petition for termination of parental rights was filed." It also found that the primary source of income for the family was Mr. Leyva, "a Mexican national, who does not have American citizenship, is of limited educational attainment, is unskilled and is earning a marginal living . . ."; that the Christley children have lived in a stable, well-balanced home environment and received all of their physical, material, educational and emotional needs for six years from the Brooks without support from their mother; and that to remove them from the Brooks to "an alien, unknown and probably unstable

---

standards are good, and that they would be able to provide for the [Christley] children. . ." Gayle L. Fleming of the State of Washington Department of Social & Health Services deposed that Mrs. Leyva "seems to have all the basic skills she needs to maintain her home. . ."

environment" was not in their best interest. Whereupon the court concluded that the children were deprived "and that the condition and causes of the deprivation are likely to continue or will not be remedied and that by reason thereof, the children will probably suffer serious physical, mental or emotional harm."

1. We find no basis from the evidence appearing in this record to support the termination of Mrs. Leyva's parental rights. In order to justify such a drastic action, the Juvenile Code requires a showing that "the child is a deprived child *and* the court finds that the conditions and causes of the deprivation are likely to continue or will not be remedied *and* that by reason thereof the child is suffering or will probably suffer *serious* physical, mental, moral or emotional harm. . ." Code Ann. § 24A-3201 (a) (2) (Ga. L. 1971, pp. 709, 747, as amended 1977, pp. 181, 182). (Emphasis supplied.)

The evidence here is uncontradicted that Mrs. Leyva and her husband are presently willing, able and eager to resume care of her children; that she has entered into a stable life since her marriage to Mr. Leyva, and that she can now provide for her children. In her own words, she has "learned so much. . . and understands about being a mother."

In *Heath v. Martin,* 225 Ga. 181, 183 (167 SE2d 153) (1969), the Supreme Court found the mother's prior instability in a bad marriage to be irrelevant. Even more recently this court enunciated reasoning and standards so appropriate to the termination of parental rights that they merit quotation in full: "Seldom does the state wield so awesome a power as when it permanently cuts the family ties between parent and child. While the state may not sit blindly idle as a child suffers unconscionable hardship, neither may it blithely intercede simply because the child's lot is sub-standard. A mother's failure fully to live up to societal norms for productivity, morality, cleanliness and responsibility does not summarily rob her of the right to raise her own offspring, nor does it end the child's right to be raised by its own mother. As expressed by Justice Ingram in *Nix v. Dept. of Human Resources,* 236 Ga. 794, 795 (225 SE2d 306): 'There can scarcely be imagined a more fundamental and

fiercely guarded right than the right of a natural parent to its offspring. To terminate that right is to sever that right for the future as effectively in law as if it never existed. It is a tearing of the flesh and it can be done by the court only under the most carefully controlled and regulated circumstances for the sake of the child. There must be compelling facts to establish the necessary lack of "proper parental care or control" justifying the government's intrusion in cutting natural family ties.'

"The words of caution quoted above, together with the expressed preference for preservation of family unity found in Code § 24A-101, counsel this court against any unreasoned expansion of the type of evidence which will suffice to show deprivation, and probable continued deprivation, causing or likely to cause serious harm to the child. Code §§ 24A-3201 (b) and 24A-401 (h). To accept the evidence offered against the appellant would be, we believe, such an unreasoned expansion.

"A review of parental right termination cases in *Elrod v. Hall County Dept. of Family & Children Serv.,* 136 Ga. App. 251, 255 (220 SE2d 726), found, 'The thread running through these cases. . . manifests *moral unfitness, physical abuse* and *abandonment. . .'* (Emphasis supplied.) The evidence in the present case shows poverty and instability in the mother's living arrangements, but it does not show any of the profoundly detrimental and egregious parental conduct which led to termination of rights in previous cases. *In re Levi,* 131 Ga. App. 348 (206 SE2d 82) (heroin addiction and frequent abandonment); *Spence v. Levi,* 133 Ga. App. 581 (211 SE2d 622) (wilful refusal to support); *Moss v. Moss,* 135 Ga. App. 401 (218 SE2d 93) (drug usage, frequent remarriage, attempt to give other child to unqualified guardian); *George v. Anderson,* 135 Ga. App. 273 (217 SE2d 609) (father murdered children's mother and grandmother). The appellant's conduct has not been exemplary, but neither has it been so extraordinary that the state should intervene and take her child away from her permanently." *R. C. N. v. State of Ga.,* 141 Ga. App. 490, 491-492 (233 SE2d 866) (1977).

There is no indication here of anything approaching "profoundly detrimental and egregious parental conduct"

except on the part of the Christley children's father, and Mrs. Leyva has been divorced from him since 1971. She deserves the benefit of the preference for preservation of family unity expressed in Code Ann. § 24A-101, and the Christley children deserve to be reunited with their natural mother, their brother Ricky and their two half-brothers. Only when a special unfitness of the parent to provide care of the child at the minimum level that society will tolerate is shown by the most compelling facts should parental rights be permanently severed, and this standard was not met here.

2. We also note that the statutory requirement of a high probability that serious harm will occur is cumulative to a finding of deprivation and its likely duration, "regardless of parental fault." *Brown v. Fulton County Dept. of Family &c. Services,* 136 Ga. App. 308, 310 (2) (220 SE2d 790) (1975). No probative evidence whatsoever has been introduced here to show that any serious harm would result from returning the children to the care of their natural mother. The clear import of the use of the word "serious" in the statute is to distinguish the normal dislocation involved in every change of surroundings. However personally preferable the court may have considered the upbringing offered these children by the Brooks, his finding of continuing deprivation if returned to their mother is simply not supported by the record.

*Judgment reversed. Quillian, P. J., and McMurray, J., concur.*

ARGUED MARCH 6, 1978 — DECIDED APRIL 6, 1978.

*Eric Drewry, Eve B. Biskind, John L. Cromartie, Jr.,* for appellant.

*Howell, Johnson & Lanier, Glenn Howell,* for appellees.