59585. PATTY v. DEPARTMENT OF HUMAN RESOURCES.

DEEN, Chief Judge.

On December 9, 1977, the Georgia Department of Human Resources acting through the Clayton County Department of Family & Children Services brought a petition in the Juvenile Court of Clayton County for the termination of Paula Patty's parental rights in her two-year-old child. After a hearing on May 25, 1978, the court found that the child was deprived and in need of continued foster care, but continued the case for three months "to give the mother an opportunity to show that she could establish a stable environment, and to present positive evidence . . . of her ability to nurture, care and provide for [the] child." After the October 26, 1978, hearing, the court found that the deprivation was likely to continue and appellant's parental rights were terminated.

1. Appellant first contends that there was insufficient evidence to find deprivation or probable continued deprivation.

At the first hearing the evidence showed that when Ms. Patty was sixteen, unmarried and four months pregnant, she was referred to DFCS for counseling and on their advice entered a Florence Crittendon home during her seventh month of pregnancy to receive further counseling. After her daughter's birth, she was unable to make a decision as to whether to keep the child or release it for adoption and requested DFCS to place it in a temporary foster home. Appellant returned to her mother's home, re-entered high school and within two weeks requested that the child be released to her. Apparently, however, there was a great deal of conflict in the home between Ms. Patty and her mother who wanted the baby released

for adoption because she felt that she could not afford to support another child. As a result, appellant requested the DFCS to provide foster care for herself and the child when it was about five and one-half weeks old. At this point, the mother and child entered a series of foster homes, sometimes together and sometimes separately until appellant was seventeen and left foster care. There is testimony that during the period Paula and her child were together in foster care she was not responsive to the child's crying and would leave the baby with a sitter for long periods of time without prior permission or letting the sitter know her whereabouts. After leaving foster care, appellant apparently left high school, changed her place of residence frequently and held several jobs. The department contends that it encouraged her to make plans to take the baby back with her, but Paula stated that she was not ready to have the child. In November of 1977, DFCS petitioned the court for temporary custody of the child alleging that the mother's whereabouts were unknown. Appellant testified that after she left foster care she did not contact DFCS about visitation but maintained contact with her child through the foster mother and after her child's foster family was changed she learned about the petition and contacted DFCS to arrange visitation.

After the hearing on October 26, 1978, the court found "that since the date of the last hearing the mother has lived in four different locations, three of which were temporary dwellings with various friends, finally locating in a small efficiency apartment in July, where she has lived since that date;

"That the mother's record of employment, since the date of the last hearing, was quite erratic including termination from three jobs that she held for brief periods of time; That two of the job terminations were as a result of failure to obey the employer's rules and as a result of insubordination.

"That at the date of the final court hearing, the mother produced no documentary evidence as to her actual earnings or wages; or her ability to financially support the child;

"In addition, the mother was unable to show any plan for the child's care during the hours she would be away from the child; That in fact the case-worker had attempted two weeks prior to the hearing date to get the mother to discuss a child care plan and was advised by the mother that she had developed no such plan; Further, the mother failed to show to the Court's satisfaction that she had, in fact, made any attempt to devise any such plan for the care of the child.

"The Court finds that the mother's actions indicate no desire to regain custody of her child, or to provide her child with proper care

and supervision, or to take an affirmative action to resist the action filed by the Family and Children Services to terminate her parental rights. Further, that said mother's actions indicate no desire on her part to remove the minor child from a deprived state as was found in the May 25, 1978, hearing."

An examination of the hearing transcript shows that these findings are both incomplete and inaccurate. From the record, it is clear that appellant attempted to comply with the court's May order to establish a stable environment for herself and the child. Although the apartment she had rented for three and one-half months prior to the hearing was small, the caseworker testified that she had visited it and found it to be adequate for Paula and her child, that it was kept spotless, that Paula had made it look real "homey," that there was a small yard in back suitable for the child to play in, and that the rent was a modest $65 a month.

As to her employment, the evidence showed that appellant was completely self-supporting and had not requested any financial assistance from a state agency since leaving foster care. She had maintained a part-time house cleaning job for the past two years which currently paid her $50 a week. This employment and her earnings as a waitress were verified by the caseworker. Appellant testified that for the past two to three weeks she had been looking for other employment to supplement her earnings from her part-time job and had just acquired employment with a named employer doing cleaning, and that the wages were $5 an hour for a twenty-five to forty hour week. That portion of the court's findings as to the reasons for two job terminations were based on the caseworker's hearsay testimony, had no probative value and should not have been included in the court's findings. See *In the interest of M. A. C.,* 244 Ga. 645, 655 (261 SE2d 590) (1979). There is no evidence in the record that appellant was ever asked by DFCS or the court to help support the child.

As to the child care plan, there was no requirement in the May order that appellant submit a child care plan to DFCS two weeks prior to the hearing. She explained to the court that she had considered various plans depending upon her working hours and that she did not have a full-time job when she talked to the caseworker. She testified that she had just obtained new employment and that her aunt had agreed to babysit for her.

We must strongly disagree with that portion of the court's order which states that the mother's actions indicate no desire to regain custody of the child or to take any affirmative action to resist the termination proceedings. The evidence at the first hearing showed that she maintained contact with the child through the

foster mother prior to the filing of the petition and when the foster mother was changed and she learned of the action against her, she contacted DFCS and arranged visitation with the child, employed an attorney, and appeared at both hearings. Her actions in renting and fixing up an apartment and finding work to supplement her income from her part-time work all indicate a desire to regain custody of the child. The caseworker testified that since the last hearing appellant had requested and received visits with her child including overnight visits and that the relationship between the mother and the child was very good. In fact, the caseworker was impressed with the way appellant handled the child when she did not wish to return with the caseworker after a recent visit.

"Seldom does the state wield so awesome a power as when it permanently cuts the family ties between parent and child. While the state may not sit blindly idle as a child suffers unconscionable hardship, neither may it blithely intercede simply because the child's lot is substandard. A mother's failure fully to live up to societal norms for productivity, morality, cleanliness and responsibility does not summarily rob her of the right to raise her own offspring, nor does it end the child's right to be raised by its own mother. As expressed by Justice Ingram in *Nix v. Dept. of Human Resources,* 236 Ga. 794, 795 (225 SE2d 306): 'There can scarcely be imagined a more fundamental and fiercely guarded right than the right of a natural parent to its offspring. To terminate that right is to sever that right for the future as effectively in law as if it never existed. It is a tearing of the flesh and it can be done by the court only under the most carefully controlled and regulated circumstances for the sake of the child. There must be compelling facts to establish the necessary lack of "proper parental care or control" justifying the government's intrusion in cutting natural family ties.'

"The words of caution quoted above, together with the expressed preference for preservation of family unity found in Code § 24A-101 counsel this court against any unreasoned expansion of the type of evidence which will suffice to show deprivation, and probable continued deprivation, causing or likely to cause serious harm to the child. Code §§ 24A-3201 (b) and 24A-401 (h). To accept the evidence offered against the appellant would be, we believe, such an unreasoned expansion.

"A review of parental right termination cases in *Elrod v. Hall County Dept. of Family & Children Serv.,* 136 Ga. App. 251, 255 (220 SE2d 726), found, 'The thread running through these cases . . . manifests *moral unfitness, physical abuse and abandonment . . .*'

(Emphasis supplied.) The evidence in the present case shows poverty and instability in the mother's living arrangements, but it does not show any of the profoundly detrimental and egregious parental conduct which led to termination of the rights in previous cases. *In re Levi,* 131 Ga. App. 348 (206 SE2d 82) (heroin addiction and frequent abandonment); *Spence v. Levi,* 133 Ga. App. 581 (211 SE2d 622) (wilful refusal to support); *Moss v. Moss,* 135 Ga. App. 401 (218 SE2d 93) (drug usage, frequent remarriage, attempt to give other child to unqualified guardian); *George v. Anderson,* 135 Ga. App. 273 (217 SE2d 609) (father murdered children's mother and grandmother). The appellant's conduct has not been exemplary, but neither has it been so extraordinary that the state should intervene and take her child away from her permanently." *R.C.N. v. State of Georgia,* 141 Ga. App. 490 (233 SE2d 866) (1977). See also *Leyva v. Brooks,* 145 Ga. App. 619, 622 (244 SE2d 119) (1978).

Accordingly, we must find that the trial judge abused her discretion in terminating appellant's parental rights. *Henderson v. Dept. of Human Resources,* 152 Ga. App. 74 (262 SE2d 241) (1979).

2. Appellant also contends that the trial court erred in terminating the rights of the putative father at the May hearing. As no objection was raised in the court below, this issue cannot be raised for the first time on appeal. *Cox v. Dept. of Human Resources,* 148 Ga. App. 43 (250 SE2d 839) (1978). Orders of the juvenile court, however, may be modified or vacated as provided in Code § 24A-2801.

*Judgment reversed. Birdsong and Sognier, JJ., concur.*

ARGUED MARCH 5, 1980 — DECIDED
APRIL 9, 1980 —
REHEARING DENIED APRIL 29, 1980.

*Philip Louis Ruppert,* for appellant.

*C. Crandle Bray, Larry A. Foster, Carol Atha Cosgrove, Assistant Attorney General,* for appellee.