178 Ga. App. 119 (1986)
342 S.E.2d 367
IN RE D. H. et al.
71209.
Court of Appeals of Georgia.
Decided March 5, 1986.
L. Eddie Benton, Jr., for appellant.
David A. Fox, for appellees.
BANKE, Chief Judge.
On February 14, 1985, the Juvenile Court of Dawson County entered an emergency shelter care order granting immediate custody of three of the appellants' six children (ages 13, 11, and 9) to the Dawson County Department of Family and Children Services, based on evidence that the children had been "subjected to acts of physical and emotional abuse by their mother and father," including being required "to remain and sleep outside in a makeshift plastic tent and not to come into their home except to eat food. . . ." The DFCS subsequently filed a petition for temporary custody, based on alleged deprivation suffered by the children as the result of their living and eating arrangements "and the fact that the children have never attended public schools. . . ."
On March 14, 1985, an evidentiary hearing was held on the temporary custody petition. At this hearing, an investigator with the Dawson County Sheriff's Department, who had gone to the appellants' home on February 14 to assist the DFCS in taking the children into protective custody, reported the following observations: "There was snow on the ground. . . . It was cold. .. . I went down to the lean-to to see what condition it was in, because I had been told that it was a habitat for the children. I got there and noticed a pile of cloth material [inside a haywagon parked inside the shelter]. I raised it up and there was a small child under this cloth material. . . . She was dressed. I asked her if she was cold and she stated that she was. Her lips were blue. She seemed to be very cold." The investigator testified that the appellants told him the children had been living in the "lean-to" for approximately two years, protecting themselves from the cold by wearing warm clothing (described by the father as "the finest clothes that money could buy") and by piling hay on top of themselves *120 at night. He testified that the appellants further told him that the children had to stay in the "lean-to" because there was not enough room for them in the appellants' mobile home.
The father testified that the family had previously lived in a 2,000 square-foot house in Louisiana but that he and his wife had made a conscious decision to adopt an agrarian, 19th Century lifestyle. He stated that he owned both his mobile home and the 110 acres of land on which it was located outright and that he had earned over $30,000 the previous year trading stocks and commodities by telephone. He controverted many of the statements made by the department's witnesses, maintaining, for example, that the children "never did put hay on top of themselves but once, and they started to sweat, so they took off the hay. . . ." He further stated that he had made it clear to the children that they did not have to stay in the shelter, expanding on this subject as follows: "That is the biggest issue here . . . [T]hey personally said they wanted to be out there, where there was more room, because the trailer was too crowded, cramped, and this was more like a metamorphosis over a period of time, and they did not stay out two years, as somebody previously testified. In fact, it was only this year that they basically slept outside the house. Last year, they were in at least half the time. . . . My wife and I refused to believe they could enjoy it out there, and they kept testifying to me that they absolutely wanted to be there, there was more room for them and they had more fun and they woke up at daybreak and could see about the horses and do things like that. So that is how this metamorphosis occurred, and we never thought anything of it, because our children are welcome in our home any time, any where, any place, any how, and that is the final testimony on that." Both parents testified that arrangements had been made to move the children back into the trailer in an effort to regain custody of them; and they stated that, although they had previously desired to educate the children at home, they were now willing to send them to public school if need be.
After hearing the evidence, the court awarded temporary custody of the children to the department, based on a finding that "the parents were subjecting the children to possible physical harm by allowing the children to remain outside in the `shelter' . . . and it was not in their best interest." However, the court acknowledged in its order that the appellants appeared to have a great deal of love and concern for their children, and he told the appellants orally at the conclusion of the hearing that while "[t]here may be some disagreement by the people from the department [and] by the court with the methods that you use,. . . I don't think anybody can disagree with your sincerity and your motivations."
Pending a dispositional hearing scheduled for March 27, 1985, *121 the trial court ordered that the children undergo a psychological evaluation. The parents also submitted to such an evaluation, and the findings and recommendations of the psychologist were summarized as follows in his report to the court:
"[The three children] are attractive [and are] without stigmata indicative of biological dysfunction. They appear to be well cared for and well nourished; indeed, they exhibit an unusual degree of radiant good health. The children appeared to be fully oriented to person, place, time, and situation and showed no signs of psychosis. They were relaxed, happy, and comfortable; they understood the nature of the interviews, and appeared to be open and honest with their answers. Based on the interview and projective test, there were no signs whatsoever of emotional maladjustment. All three children show an unusual degree of self-assuredness and a general sense of well-being. They are healthy, happy children who love their parents and family. They are quite unhappy to be in foster care and want to return home, but they appear to be suffering no harmful effects from the temporary placement. Because the bond with their family is a strong one, however, I would predict that permanent foster placement would be quite traumatic for the children should it be necessary. Each child confirmed the basic facts upon which the allegations contained in the court order are based, but each child independently provided convincing details that may well change the interpretation of those facts. For example, the children confirmed that they slept in a haywagon under a tarpaulin shelter. However, they clearly understood that they were allowed to sleep in the family's trailer if they were cold. They stated that they (the children) originally suggested the sleeping arrangements and that the parents frequently checked on them to make sure that they were warm. Indeed, each parent slept with them on one occasion to ensure the warmth of the shelter. The children confirmed that they had not been attending school, and that their parents had devoted relatively little time to their education in recent years (since moving to Georgia). When they were tested for reading achievement, however, the children were found to be reading at grade levels that are consistent with their age. . . . Because the children are obviously quite intelligent, they would probably have advanced further had they had more consistent education. On the other hand, they have not suffered from this relative lack of formal education and can be expected to advance quickly with more consistent instruction. None of the children seemed to have a strong preference for school or home education, but [one of the children, age 9] stated that she would rather attend school, while the other children said they would rather study at home. The children described their parents as concerned, kind, and loving parents who are, nonetheless, rather strict in discipline. At times, the punishments that they have received have seemed *122 unnecessarily harsh. On several occasions, the children have been whipped with a narrow stick to the point that bruises formed. Generally, punishment consists of having the children do push-ups, a technique that the father adopted from his education in a military school. Usually, the number of push-ups is tailored to the children's ability to do them and rarely exceeds 33. However, because [the oldest child, age 13] is exceptionally strong, he has been made to do as many as 300 push-ups in one day. Clearly, this number is not only excessive, but unnecessary in terms of teaching the child to behave. Perhaps my strongest concern concerns past rules about not letting the children play with children who lived nearby. Apparently because the parents did not want their neighbors to know that they had children who did not attend public school, [they] instructed their children not to play with neighbor children. Peer socialization is necessary, however, and cannot be safely denied to children. RESULTS OF EVALUATION OF PARENTS: The Minnesota Multiphasic Personality Inventory is a widely used objectively scored test in which patterns of answers to true-false questions are compared to national norms. Both parents showed normal profiles on this scale that suggest the absence of neurotic or psychotic disorder. Both parents showed a moderate elevation on the 4 scale that reflects their negative opinion of modern society, but the interview and item inspection indicated a clear lack of psychopathic trends. Both parents were fully oriented to person, place, time, and situation and showed no signs of psychosis. [The father] was rather agitated at first because the interview brought out many of his emotions concerning the enforced separation from his children. He is clearly a well-adjusted individual, but has strongly held and strongly expressed beliefs. [The mother] was rather calm and quite reasonable throughout the interview. Although she shares most of her husband's strong beliefs, she expresses them in a more conciliatory fashion. Both parents are highly intelligent and well educated. [The parents] believe that many aspects of the modern urban life-style [are] undesirable. They have chosen to live in a manner that is self-sufficient and is partly separate from the rest of society. They certainly maintain contact with others, as evidenced by [the father's] employment as a commodities trader (by telephone), but they believe that they have chosen a better style of living for themselves and their children. They do not preach distrust or disdain for other ways of living to their children, but they do explain why they believe their way of life is better. . . . Although the lifestyle chosen by the [parents] is usually associated with individuals with very liberal philosophies, [both parents] are actually extremely conservative. Their move to the country embodies their belief in the importance of personal freedom and self-reliance. Moreover, although I would not personally choose their style of living, their philosophy of life is one that they *123 have thought out carefully. Because [the father] is not particularly concerned about the impression he makes on others, however, I believe he expressed his views in a rather extreme form to the DFCS caseworker and prejudiced his own case in doing so. RECOMMENDATIONS: I believe the . . . children would not flourish away from their parents. Clearly their best interests would be served by returning them to the custody of their natural parents. However, I would only feel comfortable in making this recommendation if four conditions are met (and monitored periodically by DFCS): 1. That the children either be allowed to attend public school or that an approved home-study program be consistently implemented. 2. That the parents significantly reduce the harshness of their punishment methods. 3. That the children be allowed to play on a regular basis with peers to allow for normal social and emotional development. 4. That sleeping quarters acceptable to DFCS and the children be arranged. I discussed these conditions with the parents and I found them willing to make these changes. They acknowledge that they made some mistakes and are willing to compromise in other areas."
Based on this report and on the evidence presented at the hearing conducted on February 25, the trial court entered the following dispositional order on April 8, 1985: "(a) The above-named children shall be returned to the custody of their parents . . . no later than March 31, 1985. (b) That the parents above-named shall abstain from any unreasonable conduct, unreasonable or harsh discipline and punishment methods, including but not limited to the use of military push-ups. (c) That an appropriate (as presently agreed to by the parties) sleeping arrangement, acceptable now and in the future to the Dawson County Department of Family and Children Services, be provided for each of the children inside the home of the parents and in no event shall the children be placed outside in any type shelter or living arrangement. (d) That the parents above-named cooperate in good faith with the requests and supervision by the Dawson County Department of Family and Children Services, including allowing unannounced and unscheduled visits in their home, confirmation of sleeping arrangements and advising the Department of Family and Children Services of their whereabouts at all times. (e) That the children attend and be encouraged to attend public school in the Dawson County School system and that their record of attendance and progress be monitored by the Dawson County Department of Family and Children Services. (f) That the children be encouraged to communicate and have contact with neighbors, school officials and the Dawson County Department of Family and Children Services without the threat of retaliation, punishment or disapproval by the parents abovenamed. (g) That the parents encourage the normal social and emotional development of the children by following any directives by *124 school officials or any counselors or psychologists providing help or treatment to the parents."
It is from this order that the parents appeal. Held:
A juvenile court judge is entrusted with broad powers with respect to the disposition of a child found to be "deprived," including permitting the child to remain with his parents, guardian, or other custodian, "subject to conditions and limitations as the court prescribes, including supervision as directed by the court for the protection of the child. . . ." OCGA § 15-11-34 (a) (1). A "deprived child" is defined by OCGA § 15-11-2 (8), in pertinent part, to mean a child who "(A) Is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health or morals. . . ." It has been held that to authorize a termination of parental rights, or even a loss of temporary custody by a child's parents, on the basis of deprivation, the deprivation must be shown to have resulted from unfitness on the part of the parent, that is, either intentional or unintentional misconduct resulting in the abuse or neglect of the child or by what is tantamount to physical or mental incapability to care for the child. See Chancey v. Dept. of Human Resources, 156 Ga. App. 338 (274 SE2d 728) (1980); In re J. C. P., 167 Ga. App. 572 (307 SE2d 1) (1983). See also Blackburn v. Blackburn, 249 Ga. 689, 694 (292 SE2d 821) (1982); Carvalho v. Lewis, 247 Ga. 94, 95 (274 SE2d 471) (1981).
While we are aware of no requirement that parental unfitness be shown to support the exercise of a juvenile court's dispositional authority over deprived children pursuant to OCGA § 15-11-34 (a) (1), where neither termination of parental rights nor loss of parental custody is involved, we nevertheless find insufficient evidence in this case to support most of the sweeping restrictions imposed by the trial court. The court's own expert testified that the children are well cared for and well-nourished; that they are extremely alert, intelligent, happy, and well-adjusted; and that they enjoy a strong, loving bond with their parents. Thus, the record contains no support for a finding that the children suffered any deprivation as a result of their living conditions. Under such circumstances, it was simply beyond the court's authority to order that the children be "encouraged to communicate and have contact with neighbors," and it was simply none of the state's business whether they were allowed to sleep outside at night, so long as that was what they were happy doing and no ill effects could be attributed to it.
Absent evidence that the appellants' methods of child raising adversely affected their children's "physical, mental, or emotional health or morals" (OCGA § 15-11-2 (8) (A), supra), the conditions and restrictions imposed by paragraphs (b), (c), (d), (f), and (g) of the dispositional order must be viewed as an impermissible intrusion on the *125 appellants' rights as parents to raise their children in accordance with their own sincerely held beliefs and convictions. Thus, while we applaud the lower court's diligent concern for the well being of the children in this case, those paragraphs of the court's order must be vacated. There is, however, evidentiary support for the court's conclusion that the children have not been receiving consistent educational instruction, as required by law. See generally OCGA § 20-2-690.1. Consequently, paragraph (e) of the dispositional order, dealing with compulsory school attendance, and paragraph (e) alone, is affirmed.
Judgment affirmed in part and reversed in part. Deen, P. J., Birdsong, P. J., Sognier, Pope, and Beasley, JJ., concur. Deen, P. J., also concurs specially. McMurray, P. J., Carley and Benham, JJ., dissent.
DEEN, Presiding Judge, concurring specially.
While concurring fully with the majority opinion, other observations are appropriate.
(a) Compulsory psychological evaluation of a family's children, coupled with submitting parents to the Minnesota Multiphasic Personality Inventory Psychological evaluation, under the particular facts of this case, appears to be an unacceptable and unreasonable intrusion into family affairs by the State, if not a violation of the Right of Privacy under the First, Fourth and Ninth Amendments to the U. S. Constitution. The preamble to the new State Constitution encourages promoting "the interest . .. of the family" and does not advocate State control over the family except in grave and compelling situations. Were these types of evaluation arbitrarily used on the families of social workers, judges and others who may have unusual and other than normal living habits and situations, harsh psychological and disciplinary guidelines could well become the norm rather than the exception, as there is no assurance that any of us could pass the test.
It is presumed that parental discipline and rearing of children is proper and superior to psychological ideas set forth by an employee of the State, who also may never have raised any children at least until the contrary is shown. Care, caution and circumspection should be used prior to authorizing psychological tests of this nature. See Southern Bell Tel. &c. Co. v. Sharara, 167 Ga. App. 665, 668 (307 SE2d 129) (1983). The appellee did not by clear and convincing evidence remove this presumption or in my opinion prove its case. While parental requirements of 300 push-ups by the children in one day may be excessive and rules of not letting the children play with other children who live nearby is not normal and is inadvisable, who is to say that these children are not more mentally and physically fit than *126 others who may be required to spend 300 hours every two months in play therapy or magic circle, or glued to the TV set? The interest in outdoor exercise, nutrition, and a type of living off the land on this rural, over 100-acre tract might appear to be attractive to many urban residents living in crowded areas.
(b) The test when a third party is challenging parental control centers on the fitness or unfitness of the parents. In this case, the trial judge applied some criteria looking to the "best interests of the child" standard, which is applicable only where the custody or termination proceeding involves one parent against another.
(c) Parental misconduct, inability, or minor deprivation, not amounting to "moral unfitness, physical abuse and abandonment" falls short of permitting State control over the family. Patty v. Dept. of Human Resources, 154 Ga. App. 455 (269 SE2d 30) (1980). Otherwise, it could be argued that most parents have some type of psychological, financial, emotional or moral limitation, inability or hang up, which would result in all children becoming subject to psychological custody and control in a mythical Brave New World becoming a reality.
In the instant case, the rugged outdoor lifestyle, advanced by "Mother Earth News" of advocating physical fitness training for children, might appear unusual to many; but to others, it may seem consistent with good family fitness, civil defense training, and may recall the outdoor family life experienced during the frontier days by pioneer settlers, in their log cabins or Conestoga Wagons, who made this country great. The point is that even in this era of space-age child rearing, the old earthy values of mental and physical toughness, although perhaps on the endangered species list, may not be extinct. (The growing army of roadside joggers may serve as a daily reminder of this.) It is not yet the proper role of the state to invalidate them.
Except for requiring school attendance, at either a regular school or an approved home school, I believe that the trial court abused its discretion in all other aspects of its order of April 8, 1985, and reversal of that order is necessary as outlined in the majority opinion.
McMURRAY, Presiding Judge, dissenting.
I must respectfully dissent. I cannot accept the result reached by the majority, as in my view the juvenile court should be affirmed.
In my view, the determination of deprivation is an exercise of discretion by the juvenile court and if based upon evidence, will not be controlled by this court absent abuse of discretion. See In re D. C. & J. T. C., 176 Ga. App. 30 (335 SE2d 148). No such abuse of discretion has been shown in this case. See Jones v. Dept. of Human Resources, 155 Ga. App. 371 (271 SE2d 27); Painter v. Barkley, 157 Ga. App. 69 (276 SE2d 850). See generally 36 Mer.L.Rev. 167, 175.
*127 I am authorized to state that Judge Benham joins in this dissent.