## 38561. BLACKBURN v. BLACKBURN.

GREGORY, Justice.

This case involves a dispute for custody of a minor child between the child's natural mother and his paternal grandmother.

Appellant was divorced from appellee's son in July, 1979. Under the terms of the separation agreement, appellant received custody of the only child of the marriage, Nicholas Evans Blackburn. In May, 1981 appellant gave birth to an illegitimate daughter. On June 25, 1981 appellee filed a petition for change of custody[1] in Jenkins Superior Court, seeking legal custody of Nicholas Blackburn on the grounds that appellant had failed to provide necessities for the child; that appellant "frequently" left the child unattended; and that appellant "has been a lewd person" who "has given birth to an illegitimate, racially mixed child" since she was granted custody of Nicholas Blackburn. On the same day the trial court issued an ex parte order giving appellee temporary custody of Nicholas Blackburn. On November 2, 1981 following a hearing and the submission of briefs by the parties, the trial court awarded permanent custody of the child to appellee, finding by "clear and convincing evidence [that appellant] has surrendered her right to custody of the child." In its order the trial court found that appellant "has failed to provide adequate supervision, moral guidance and medical attention as are necessary for the child's well-being and the [appellant] has given birth to an illegitimate female child while in custody of . . . Nicholas Evans Blackburn has become an unfit custodian of Nicholas Evans Blackburn." In an addendum to this order, filed February 15, 1982, the trial court specified that its original finding of appellant's unfitness was based on the following facts: (1) appellant had sexual intercourse with a man to whom she was not married; from this relationship was born an illegitimate daughter; (2) appellant "took the child out in her car at 1:00 or 2:00 in the morning"; (3) when appellant worked in a hospital cafeteria the child was left to play on the floor; and (4) "the child was not growing

---

[1] Appellee's son, the natural father of the child, is not a party to this action.

or increasing in weight."

Appellant's application for discretionary appeal was denied by the Court of Appeals. We granted certiorari to consider "whether there was clear and convincing evidence (exclusive of the issue of race) of the natural mother's unfitness as a parent, which authorized the termination of her custody of her legitimate child."

(1) At the hearing on the petition for change of custody, appellee testified that on one occasion she had visited Nicholas while he was in appellant's custody, and found him playing with other children in the parking lot of appellant's apartment building; appellee testified that the child was not under adult supervision and that appellant was "about 300 feet" away from the child. Appellee also testified that on one occasion appellant fed Nicholas a bottle of milk which had been unrefrigerated for nine hours; as a result the child developed diarrhea. Appellee was permitted to state her opinion that appellant is an immoral person because she has given birth to an illegitimate daughter. Appellee also testified that on occasion when she visited appellant's apartment she found it to be dirty, that sometimes Nicholas's diapers needed changing and that the child was frequently sick.

The child's physician, Dr. Abreu, testified he had treated Nicholas once for an ear infection in June, 1979; for respiratory infections in November, 1979, February, 1981 and August, 1981; and for a gastrointestinal disorder in June, 1981. This witness testified that respiratory disorders are "normal . . . in children . . . [T]hey develop some kind of respiratory condition frequently, mainly during the winter time." Dr. Abreu opined, however, that "the patient wasn't growing according to normal" as he had gained only two pounds between February, 1981 and August, 1981. Dr. Abreu testified that a six pound gain would be "normal" for this time frame.[2] The physician stated his belief that it was an unwise practice to allow the child to play in the hospital cafeteria while appellant worked there, as "a high degree of contamination" exists in the hospital cafeteria. When asked whether he had any reason to believe appellant was not meeting the child's needs, Dr. Abreu responded, "I cannot say too much because I see the child only when the child was sick. It's true that the mother was with the child always when I saw the child in the emergency room or in the hospital or in my office."

Prior to the completion of construction on the apartment in which appellant has resided for approximately two years, she lived in

---

[2] Medical records show the child gained no weight between February and June, 1981. Between June 26 and August 13, 1981, Nicholas gained two pounds.

a Jenkins County Motel. The night clerk at this motel testified that she sometimes saw appellant leave the motel with Nicholas as late as 2:00 in the morning. When asked if she observed visitors going to appellant's motel room, she responded, "Yes sir. Oh, I don't know, I couldn't see her motel or anything."

Appellant admitted that children from her apartment complex played in the complex parking lot as there was no play area available. She testified, however, that the mothers of these children took turns supervising the children while they played there. This testimony was corroborated by the testimony of another resident of the complex who stated that she frequently supervised the children herself. Appellant also testified that during the time she worked in the hospital cafeteria[3] she was forced to allow Nicholas to remain there with her from 7:00 a.m. to 8:00 a.m. as the child's babysitter would not accept him before 8:00 a.m. Appellant admitted that her relationship with the father of her illegitimate daughter is ongoing and that she has entertained him in her home. She maintained, however, that she had never had sexual relations with this man while Nicholas was present in the apartment.

Appellant also offered the testimony of a grocery store cashier that she had observed appellant buying "mostly fruits and vegetables . . . several times a week" while Nicholas was in appellant's custody.

Pursuant to an agreement between the parties, the trial court ordered the Department of Family and Children's Services to evaluate the home life of both appellant and appellee. The caseworker who visited appellant noted in her report that the occasions when appellant left the motel with Nicholas in the early morning hours indicated "a lack of mature judgment." However, this report also states that appellant "has [presently] exhibited some maturity and good judgment in generally providing adequate housing and daycare for her [daughter] despite limited funds.[4] She has been resourceful in meeting [her daughter's] basic needs on a limited income . . . . [Appellant] presently has an adequate child care plan while she is working." The caseworker also noted that while appellant's apartment is "orderly" and "adequately furnished," there are "numerous cockroaches" in the kitchen.

(2) In an action for divorce where custody is an issue, the trial court exercises its discretion in awarding custody by determining "the best interests of the child." On appeal this court will affirm the award if there exists "any evidence" in the record to support the trial court's

---

[3] Appellant is now employed by Crider's Poultry Processors.

[4] The record shows that Nicholas's father does not pay child support. The father of appellant's illegitimate daughter pays between $55-$75 per month in child support.

decision. *Gazaway v. Brackett,* 241 Ga. 127, 128 (244 SE2d 238) (1978). However, where a third party sues the custodial parent to obtain custody of a child and to terminate the parent's custodial rights in the child, we have required a stricter standard. In such a case, the parent is entitled to custody of the child unless the third party shows by "clear and convincing evidence" that the parent is unfit or otherwise not entitled to custody under Code Ann. §§ 74-108, 74-109 or 74-110.[5] Additionally, evidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in his natural child; clear and convincing evidence of *present* unfitness is required. *Wright v. Hanson,* 248 Ga. 523 (283 SE2d 882) (1981); *Shaddrix v. Womack,* 231 Ga. 628 (6) (203 SE2d 225) (1974). On review the award of custody to a third party will be affirmed only if there is "reasonable evidence" to support it. *Wright v. Hanson,* supra; *Miele v. Gregory,* 248 Ga. 93 (281 SE2d 565) (1981); *Gazaway v. Brackett,* supra; *White v. Bryan,* 236 Ga. 349, 350 (223 SE2d 710) (1976).

Acknowledging that "freedom of personal choice in matters of family life is a fundamental liberty interest" protected by the United States Constitution, the United States Supreme Court has recently held that the Due Process Clause of the Fourteenth Amendment demands that before a state may sever the rights of parents in their natural child, the state must support its allegations "by *at least* clear and convincing evidence." (Emphasis supplied.) Santosky v. Kramer, —— U. S. —— (102 SC 1388, 71 LE2d 599) (1982).

Requiring that the trial court find "clear and convincing evidence" of a parent's unfitness prior to terminating the parent's

---

[5] Code Ann. § 74-108 provides, in part, that the parental power over a child may be lost through (a) voluntary contract to a third party; (b) consent to adoption of the child by a third party; (c) failure to provide "necessaries" for the child or abandonment of the child; or (d) cruel treatment of the child.

Code Ann. § 74-109 authorizes the probate court to appoint a guardian for a child who has received cruel treatment at the hands of his parents.

Code Ann. § 74-110 provides, in part, that the probate court may appoint a guardian for a child "being reared under immoral, obscene or indecent influences likely to degrade his moral character and devote him to vicious life."

Every state in the union has a statutory scheme authorizing the termination of parental rights in a natural child upon findings of inadequate care or cruel treatment of the child. The rationale for these statutes originated in the doctrine of *parens patriae,* literally, "father of the country." The basis of this doctrine is that the state has a legitimate interest in protecting those individuals unable to protect themselves. See, generally, Comment, "Application of the Vagueness Doctrine to Statutes Terminating Parental Rights," 1980 Duke Law Journal, 336-359; and Note, "The Right to Family Integrity: A Substantive Due Process Approach to State Removal and Termination Proceedings," 68 Georgetown Law Journal, 213-248 (1980).

rights in his child reflects the value society places on the "freedom of personal choice in matters of family life" and the judgment society makes "about how the risk of error should be distributed between the litigants." Santosky, supra, 102 SC 1395. Demanding that this high burden of proof be met furthers the State's legitimate interest in protecting the child, yet forestalls arbitrary State interference with the integrity of the family unit. It also reduces the " 'possible risk that a factfinder might decide to (deprive) an individual [of the rights to his child] based solely on a few isolated instances of unusual conduct (or) . . . idiosyncratic behavior.' " Santosky, supra, at 1400; Addington v. Texas, 441 U. S. 418, 427 (99 SC 1804, 60 LE2d 323) (1979).

Noting that the appropriate burden of proof in a given type of case is "shaped by the risk of error inherent in the truth-finding process," Santosky at 1396, the Supreme Court acknowledged that the goal of society is to restrict the possibility of error in termination of parental rights cases more so than in civil cases where the burden of proof may be met by a "preponderance of the evidence" and the risk of error is fairly equally allocated to the parties. Conversely, the Court found that the application of a reasonable doubt standard would not be proper in a termination of parental rights proceeding because evidence "adduced at [these] proceedings is rarely susceptible to proof beyond a reasonable doubt." 102 SC 1402.

In the wake of the Supreme Court's holding that the quantum of proof we have heretofore required to terminate a natural parent's custodial rights in his child is mandated by the Constitution, we are left to determine whether the "reasonable evidence" standard of appellate review in such a case remains viable.

"[J]udicial review is generally limited to ascertaining whether the evidence relied upon by the trier of fact was of sufficient quality and substantiality to support the rationality of the judgment." Woodby v. Immigration and Naturalization Service, 385 U. S. 276, 282 (87 SC 483, 17 LE2d 362) (1966). Where a fundamental liberty interest involving the right to "the companionship, care, custody, and management [of a child]" is at stake, 102 SC 1397, neither the "any evidence" standard of review in civil cases nor the "reasonable evidence" standard of review currently applied in termination of parental rights cases is of "sufficient quality and substantiality to support the rationality of the judgment." Rather, we hold that due process requires that we afford this liberty interest the same protection on appellate review as we afford those constitutionally protected interests in cases where a criminal conviction is had. In this regard we look for guidance to the scope of review in criminal cases set forth in Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560)

(1979).[6] We hold that the appropriate standard of appellate review in a case where a parent's rights to his child have been severed is "whether after reviewing the evidence in the light most favorable to the appellee, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost." This standard of review safeguards the high value society places on the integrity of the family unit and helps eliminate the risk that a factfinder might base his determination "on a few isolated instances of unusual conduct [or] . . . idiosyncratic behavior." 102 SC 1400.

We hasten to point out that in determining whether the appellee has met her burden of showing by clear and convincing evidence that appellant's rights to the custody of her child should be terminated, it is not the duty of the trial court to strike a balance between the relative merits of the third party seeking custody and the parent. "A finding of unfitness must center on the parent alone, that is, can the parent provide for the child sufficiently so that the government is not forced to step in and separate the child from the parent. A court is not allowed to terminate a parent's natural right because it has determined that the child might have better financial, educational or *even moral advantages* elsewhere. . . . Only under compelling circumstances found to exist by clear and convincing proof may a court sever the parent-child custodial relationship." (Emphasis supplied.) *Carvalho v. Lewis,* 247 Ga. 94, 95 (274 SE2d 471) (1981).

We find that appellee's evidence falls short of demonstrating present unfitness such as to justify the termination of appellant's rights in her son. This evidence showed that on several occasions over two years ago, appellant allowed her son to accompany her on late night trips. The evidence also showed that appellant allowed her son to remain for one hour each day in a hospital cafeteria where there existed a "high degree of contamination." However, appellant is no longer employed by the hospital and the DFCS report indicates that she now has an adequate child care plan. The child's physician testified that it is normal for a child to be beseiged with respiratory ailments during the winter months, as was the case with Nicholas's illnesses while in the custody of appellant. Further, the doctor did not give an opinion as to why Nicholas failed to gain weight while in appellant's care. In a case where the substantial rights of a parent to custody are at stake, we will not infer from the doctor's conclusion

---

[6] By reference to the standard for appellate review in criminal cases, we do not mean to suggest that, on review, any application of the beyond a reasonable doubt standard will come into play.

that Nicholas's failure to gain weight was "not normal" that appellant failed to properly care for the child. Examining the record as a whole we conclude that the evidence fails to meet the standard of appellate review we now adopt. We do not mean to suggest by this conclusion, however, that appellant's extra-marital relationship resulting in the birth of an illegitimate child should be condoned. It would be unrealistic to ignore the fact that society may stigmatize Nicholas because his sibling is illegitimate. However, we do not think that the fact that appellant has borne an illegitimate daughter is sufficient evidence of appellant's unfitness to raise Nicholas. Rather, the record shows that appellant is presently exercising "maturity and good judgment" and "resourcefulness" in providing for her daughter on a limited income. There is nothing in the record to suggest that she would not exercise this same maturity, good judgment and resourcefulness in providing for Nicholas.

*Judgment reversed. All the Justices concur, except Jordan, C. J., who concurs specially, and Marshall and Smith, JJ., who dissent.*

DECIDED JUNE 29, 1982 —
REHEARING DENIED JULY 21, 1982.

*Ozell Hudson, Mary Carden, William J. Cobb, John L. Cromartie, Jr.,* for appellant.
*Robert Sims Lanier,* for appellee.

JORDAN, Chief Justice, concurring specially.

I agree with the judgment reversing the trial court but for a different reason. The trial court should have granted the defendant's motion to dismiss the plaintiff's action for lack of standing.

In my opinion the natural father was a necessary and indispensable party to this action. The natural father clearly had an interest in the custody of his minor son. There has been no hearing as to his parental rights and those rights have not been adjudicated.

In this case the father sought custody of the child in the divorce action. The award of custody to the mother in the divorce action did not terminate the father's rights. In the event of death of the mother the prima facie right to custody automatically inures to the surviving parent. *Howell v. Gossett,* 234 Ga. 145 (214 SE2d 882) (1975). The same rule would apply where the mother has surrendered her right to custody, which the trial judge said she had done in this case. Under these circumstances, prima facie custody vested in the natural father absent a showing of unfitness, voluntary surrender, abandonment,

etc. Therefore, the grandmother had no standing unless and until the father's rights were adjudicated.

In the landmark case of Stanley v. Illinois, 405 U. S. 645 (92 SC 1208, 31 LE2d 551) (1972) the United States Supreme Court held that this right inures to the natural father even though not married to the deceased mother and that due process entitles an unmarried father to a hearing on his fitness before his children can be taken from him.

A different standard applies in a contest for custody between the natural parents and a contest between a parent and a third person. A finding of the mother's unfitness would not be necessary to authorize an award of custody to the father.

I would remand this case to the trial court for a determination of the rights of the natural father of the child. In my opinion this must be done before the custody can be awarded to a third person.

SMITH, Justice, dissenting.

I respectfully dissent from the majority opinion.

Appellant divorced her husband in July 1979. Custody of their six-month-old son was awarded to appellant. In May 1981, appellant gave birth to an illegitimate female child. Appellee, the paternal grandmother of appellant's legitimate child, thereafter filed a petition in the Superior Court of Jenkins County, Georgia, seeking custody of her grandson.

After hearing, the trial court found that appellant had by her conduct "surrendered her right to continued custody of the minor child" and awarded permanent custody to appellee. Appellant's application for appellate review to the Court of Appeals was denied. We granted certiorari to determine "[w]hether there was clear and convincing evidence (exclusive of the issue of race) of the natural mother's unfitness as a parent, which authorized the termination of her custody of her legitimate child." For reasons that follow, I would affirm the order of the trial court.

Appellant contends that there was no clear and convincing evidence presented that she was unfit or that one of the conditions set forth in Code Ann. §§ 74-108, 74-109 or 74-110 were met; therefore, appellant contends, the trial court obviously based its award of custody on either a) appellant's giving birth to a child out of wedlock or b) racial considerations, neither of which would be proper bases for depriving appellant of the custody of her child.

I cannot agree that the evidence was insufficient to justify the termination of appellant's right to custody, nor can I agree that the trial court's order was based upon improper considerations. The record shows the following.

Appellant moved six times after her divorce. While living in a motel registered under a name other than Blackburn, appellant frequently had late night guests and often left with her son after midnight, returning hours later. As a result her son was usually sleepy and lethargic during the day.

While appellant worked at a local hospital, she took her son to work with her, where he played unattended on cold tile floors, exposing him, in the opinion of his physician, Dr. Abreu, to a high risk of disease contamination.

Later, appellant, now unemployed, moved into an apartment. Although she now had more free time, she nonetheless allowed her son to play unattended in a heavily traveled parking lot some 300 feet from her apartment.

Appellant did not have the time to properly supervise her son or to clean her apartment, which was dirty and cockroach infested, but she did find the time to have an affair with a married police officer. His visits supposedly were of short duration, lasting "a few minutes, at the most maybe half an hour." However, these visits involved sexual intercourse and resulted in the birth of an illegitimate child.

Appellant failed to properly clothe her son for cold weather. His diapers were often soaking wet. On at least one occasion, appellant fed her child a bottle of milk formula that had been left unrefrigerated overnight. As a result of this lack of care, the child had constant bouts of respiratory and gastrointestinal problems.

On several occasions, the child was left for extended periods of time with appellee. On each occasion, the child was sick upon his arrival and healthy when he departed. In the four months preceding appellee's acquisition of custody, the child gained no weight at all. During the first month of appellee's custody, the child gained two pounds. In Dr. Abreu's opinion, appellant failed to take proper care of her son.

The trial court recognized that appellant's right to custody of her child could be lost only upon a clear and convincing showing of appellant's unfitness as a parent or that one of the conditions set forth in Code Ann. §§ 74-108, 109, or 110 were met. See *Wright v. Hanson,* 248 Ga. 523 (283 SE2d 88) (1981) and *Miele v. Gregory,* 248 Ga. 93 (281 SE2d 565) (1981). Under our decisions prior to this case, therefore, the trial court's decision to terminate appellant's right to custody must be affirmed if there is reasonable evidence to support it. *Gazaway v. Brackett,* 241 Ga. 127 (244 SE2d 238) (1978); *White v. Bryan,* 236 Ga. 349, 350 (223 SE2d 710) (1976). There is certainly reasonable evidence in the record of this case to support a finding that appellant failed to provide necessaries for the child and that the child

was being reared under immoral influences likely to degrade his moral character. See Code Ann. §§ 74-108 (a) (3) and 74-110.[1]

Today's decision, however, marks a radical departure from our earlier cases defining the scope of appellate review in child custody cases. The majority opinion today abandons the long-standing "reasonable evidence" standard of review in favor of a stricter, constitutionally-based rule requiring that we affirm only if "any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost." The majority apparently believes that two recent Supreme Court decisions, Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979), and Santosky v. Kramer, —— U. S. —— (102 SC 1388, 71 LE2d 599) (1982), require such a result. I disagree. Neither Jackson v. Virginia nor Santosky is even remotely applicable to the issue of the correct standard to be applied in appellate review of child custody decrees. Jackson dealt with the proper standard of review of state *criminal* convictions by a federal habeas court and is thus inapplicable here. The Santosky case, so heavily relied upon by the majority, does not even discuss appellate review. That decision is concerned solely with the standard of proof to be applied by a trial court in a proceeding to terminate parental rights. Moreover, Santosky did not effect any significant change in Georgia law, since our cases have long required that a third party seeking custody prove his case by "clear and convincing" evidence. See *Wright v. Hanson,* supra; 102 SC 1388, 1392, n. 3.

I cannot agree that the majority's new constitutional standard of review will help to "safeguard the high value society places on the integrity of the family unit." I believe that introduction of the new standard will have exactly the opposite effect: heightened appellate scrutiny of trial court custody decrees can only cause confusion in judicial administration and encourage appeals and protracted litigation of custody disputes. This increased appellate involvement in family disputes will in my opinion tend to erode, rather than safeguard, the family unit. The practical effect of today's decision is to allow this court to substitute its judgment for that of the trial court. I believe that the sort of judicial second-guessing of the trial judge encouraged by the majority opinion is unwise, particularly in the delicate area of child custody disputes. Furthermore, the majority's approach in this case is inconsistent with the decision in *Dur-*

---

[1]*Phelps v. Phelps,* 230 Ga. 243 (196 SE2d 426) (1973), is inapplicable. Appellant's right to custody of her illegitimate child is not an issue in this case and custody of her illegitimate child was not "awarded" to appellant.

*den v. Barron* 249 Ga. 686 (1982), as revised on motion for reconsideration, June 29, 1982, where we held that once custody has been awarded to a third party in a proceeding to which a parent was a party, "the parent can regain custody upon showing by clear and convincing evidence his or her present fitness as a parent and that it is in the *best interest of the child that custody be changed.*" (Emphasis supplied.) Id. at 686.

Assuming, as appellant contends, that an act of fornication resulting in the birth of an illegitimate child could not, standing alone, render a mother unfit in light of Code Ann. § 74-203,[2] nonetheless, "it is not error to admit testimony tending to throw light on the moral character of a party to the action seeking such custody [of a minor child], since this is one of the issues for the consideration of the trial court." *Eller v. Matthews,* 216 Ga. 315 (3) (116 SE2d 235) (1960). Numerous decisions of this state's appellate courts have upheld trial court findings of parental unfitness based on violations of our laws dealing with adultery, fornication, drugs and other crimes. See *Godfrey v. Godfrey,* 239 Ga. 707 (238 SE2d 378) (1977) (adultery); *Collier v. Collier,* 228 Ga. 38 (183 SE2d 769) (1971) (adultery); *Wilbanks v. Wilbanks,* 220 Ga. 665 (141 SE2d 161) (1965) ("immoral conduct" and birth of an illegitimate child); *Bell v. Bell,* 154 Ga. App. 290 (267 SE2d 894) (1980) (cohabitation); *Henderson v. Dept. of Human Resources,* 152 Ga. App. 74 (262 SE2d 241) (1979) (heroin usage and repeated arrests). The trial court's award of custody was properly based in part upon appellant's immoral conduct.

Appellant argues that since the evidence does not support the court's decision terminating her right to custody and since she is white and the father of her illegitimate daughter is black, the trial court's decision was necessarily based on racial considerations. I cannot agree. First, appellee complained to the local office of the Department of Family and Children Services that her grandson was not being properly cared for long before appellant gave birth to a racially mixed child. Second, two superior court judges have ordered that custody of the child be awarded to appellee.[3] Finally, the issue of race was injected by appellant, not appellee, and appellant was rebuked for doing so. I find nothing in the record of this case to support appellant's allegation that the trial court's decision was

---

[2] Code Ann. § 74-203 gives a mother the presumptive right to custody of her illegitimate child.

[3] Judge Faye Martin awarded temporary custody to appellee pending a final hearing.

based on race.[4]

I am authorized to state that Justice Marshall joins in this dissent.

---

[4] Appellant and amicus curiae have referred to evidentiary matters either not in the record at all, or matters not presented until after the final hearing. The former cannot be considered in any event and appellant failed to show that the latter could not have been timely presented had appellant exercised due diligence. See Code Ann. § 81A-143 (a); *Williams v. State,* 249 Ga. 6 (7) (287 SE2d 31) (1982).