72419. IN RE K. H.
72420. IN RE B. A. H.
(345 SE2d 108)

DEEN, Presiding Judge.

On August 23, 1985, the Houston County Department of Family and Children Services (DFCS) brought petitions to terminate the parental rights of (a) Tina Harding Alford to her five-year-old son, K. H., and (b) Daphne Harding to her six-year-old son, B. A. H.

Daphne Harding was the mother of Tina Alford, and they have always lived together. On December 5, 1985, the juvenile court granted the petitions, and both Tina Alford and Daphne Harding appeal.

The evidence shows that Tina Alford was considerably more successful at child-bearing than child-rearing. In 1975, at the age of 17, she gave birth to twin girls, whom she released to the DFCS for adoption. In 1977 she gave birth to another daughter out of wedlock and likewise released this child for adoption. In January 1984 this history repeated itself. In 1985 she gave birth to another daughter, fathered by her common-law husband, David Alford, and she kept this child. Remarkably, except for the twins, it appears that all of Tina Alford's children, including K. H., who was born in July 1980, were born at home without any medical aid. It also appears that Daphne Harding similarly gave birth to B. A. H. at home.

The DFCS provided continuous assistance to both appellants from 1980 until the children were removed from the home and placed in temporary foster care in June 1984. During that span of time, the appellants taxed the patience of numerous DFCS caseworkers and community workers. At virtually every one of the many residences inhabited by them during that time, the appellants brought about and maintained deplorable living conditions. Admittedly, because of financial distress, they could afford less than ideal housing, but they were unmistakably methodical in their squalor. Garbage would be piled up inside the residence for long periods of time, and refuse strewn about outside as well; roaches were legion; several cats were kept in the home and no effort was made to clean up their feces or urine; the appellants lived a year at one residence without running water or electricity and made no effort to improve that situation; floors and dishes went uncleaned.

The caseworkers and community workers testified that, in response to the appellants' claim that they could not afford cleaning supplies, the DFCS would occasionally furnish such supplies but that the appellants did not use them. The appellants always made excuses for whatever condition the county workers urged them to improve, never once accepting any responsibility for the situation.

Cats in particular appear to have had some bizarre significance to the appellants' household. (Daphne Harding's nickname, in fact, was "Cat.") Because of the stench of cat feces and urine in the home, the county workers encouraged the appellants to get rid of the cats or keep them outside, but the appellants claimed the animals were necessary to ward off rats and roaches. (At one time, the appellants also maintained two "skin and bones" dogs, but one eventually died of maggot infestation.) During one visit, a DFCS worker found the appellants distraught over Daphne Harding's son's having been imprisoned. At that time, the appellants brandished what they identified as

a stick of dynamite (and the caseworker also observed a handgun on top of the television), and claimed that they were going to blow up the son's probation officer. They also blamed all of their bad luck on a former lover of Tina Alford, who they were convinced was the devil incarnate; although this devil lover was also in prison, they explained that he had the ability to leave his body and travel invisibly to wherever they were and plague them. The appellants suspected that this demon may have entered the body of one of their cats, and they intended to check the toes of their cats in order to detect any invasion. On a subsequent visit, another worker observed a bird's wing hanging on the door, and what appeared to be a cat's leg suspended from the ceiling. (David Alford later identified these objects as an owl's wing and a bobcat's foot, spoils of his hunting or trapping.)

The DFCS caseworkers and community workers often found the baby K. H. pinned in a corner by a coffee table that was turned over sideways. B. A. H. often was kept locked in a bedroom. All the workers observed that both appellants usually ignored these children, although Daphne Harding frequently addressed B. A. H. with hostility and profanity. Specifically, she referred to him as a "goddamn little shit" and would discipline him with orders such as "get your goddamn ass out of here or I'll whip the hell out of you." (During the termination hearing, Daphne Harding professed not to use profane language, pointing out that her son was now a minister, although she had already testified, "I don't give a shit what anybody says. My babies come first with me.")

Both children were often dressed inadequately or went about in soiled diapers or rags. Although Daphne Harding did seek medical treatment for B. A. H. after he received an electrical shock, all other medical care of the children was instigated (and often greeted by the appellants' reluctance) by the DFCS caseworkers. The two children constantly had colds. On one occasion, K. H. developed such a severe case of diaper rash that when the caseworkers discovered it and sought medical treatment, the doctor at first thought hospitalization of the child would be necessary. When the DFCS workers retrieved Tina Alford's child born in January 1984, the baby also had severe diaper rash and ringworm. When the DFCS removed B. A. H. and K. H. from the appellants' home in June 1984, both children were so extensively bitten by fleas that the caseworkers took the children to the hospital. During the examination, B. A. H. became hysterical when his pants were lowered and he pleaded for the doctor not to "butt test" him; when asked what that meant, B. A. H. replied "stick brown stick up my butt."

One DFCS worker recounted that on two occasions Tina Alford had openly smoked marijuana in her presence. Shortly before the children were removed from the appellants' home, the county depart-

ment received a report that the children were being allowed to smoke marijuana. To investigate this report, one worker picked up the children ostensibly to take them to the library for story time, and then took them to the DFCS office afterwards. Another worker fixed a cigarette to look like a marijuana joint and left it conspicuous on an ash tray. B. A. H. saw it and asked the worker if she would like to smoke a joint; the cigarette was lighted, and B. A. H. proceeded to smoke it, inhaling without any problem. K. H. asked for some, too, but was unable to inhale successfully. After putting out the cigarette, B. A. H. acted relaxed, remarked that he was "fucked up," and stated that his mother gave him pot.

After the removal of the children from the home, the DFCS wanted to make arrangements with both appellants for visitation of the children, but for almost six months neither appellant contacted the agency. One caseworker eventually re-established contact in January 1985 through the mother of David Alford, and a visitation schedule was set up; however, the appellants only sporadically observed the schedule and on several occasions failed to contact the county department to report that they would be unable to make the visit.

Also following the removal of the children from the appellants' home, psychological evaluations revealed both children to be underdeveloped in language and social skills, which condition was attributed to inadequate stimuli at home. B. A. H. was diagnosed as a hyperactive child and was placed on Ritalin. The evaluation also stressed that because of his hyperactivity, B. A. H. would require much special attention. During the visitation sessions, the two children exhibited fear of their mothers.

At the hearing, both appellants testified that they had not contacted the DFCS during the first six months after the removal of the children from their home, because they had lived in the woods or the streets and thought that it might upset both themselves and the children to visit. They stated that their current circumstances were more promising than before. The appellants, David Alford, and Tina Alford's baby by David were temporarily living with some friends in the Atlanta area, but they claimed to have found a house to move to as soon as they completed some repairs. David Alford worked full time, allegedly grossing $400 weekly, and both appellants also were working some, with Tina Alford earning $120-150 in a full week and Daphne Harding earning approximately $70 weekly part-time. They had all previously been living in a house by themselves but had moved out when the landlord increased the rent to $450 per month. Notwithstanding this claim of income, Tina Alford also explained her frequent failure to contact the DFCS about visiting the children by claiming that she could not afford to pay for the long-distance calls. Daphne Harding also expressed her future intention of moving to

Mississippi, where her minister son lived, and finding a job there. She felt that she could provide an adequate home for B. A. H. and believed that his present fear of her was due to the medication given him; she asserted that she would stop administering the Ritalin and instead would give him vitamins for his hyperactivity. *Held*:

1. In Appeal No. 72419, Tina Alford contends that the trial court erred in denying her motion for a continuance brought by her attorney on the basis that he had not had adequate time to prepare for the case. The record shows that both appellants were served by certified mail that the termination hearing was scheduled for October 10, 1985, and that they were therein advised that they should contact the court if they desired legal counsel to be appointed for them. On October 8, 1985, not having heard from either appellant but deeming legal representation for them to be necessary, the juvenile court appointed counsel for the appellants and served them with (a) notice of the appointments, (b) instructions to contact their attorneys, and (c) notice that the hearing had been rescheduled for 10:00 a.m. on October 24, 1985. Although Tina Alford telephoned her attorney's office once in hopes of setting up an appointment, neither appellant had otherwise communicated with their appointed counsel until they showed up for the hearing, which they did over two and a half hours late. A motion for a continuance addresses the discretion of the trial court, *Melton v. State*, 175 Ga. App. 472 (333 SE2d 682) (1985), and under the circumstances in this case the juvenile court did not abuse its discretion in denying that motion.

2. Tina Alford also contends that the juvenile court erred in allowing four individuals to remain in the courtroom during the hearing, although she does not attempt to demonstrate the harm of such an alleged impropriety. OCGA § 15-11-28 (c) provides that "[t]he general public shall be excluded from hearings involving delinquency, deprivation, or unruliness. Only the parties, their counsel, witnesses, persons accompanying a party for his assistance, and any other persons as the court finds have a proper interest in the proceeding or in the work of the court may be admitted by the court." The four individuals identified by the appellant included Carolyn Schomer, supervisor of the Houston County DFCS protective services division; Lib Lilliston, supervisor of the DFCS child placement unit; Mary Ferguson, who was in charge of the Perry office of the DFCS; and Debbie Strange, director of the DFCS. (Only Carolyn Schomer served as a witness, and she testified first.) All four of the individuals obviously held a proper interest in this proceeding because they would have the duty of implementing the juvenile court's disposition of the two termination petitions. Accordingly, there was no error in allowing them to observe the hearing.

3. Tina Alford also contends that the evidence concerning events

in her life that occurred prior to the date K. H. was removed from her home was irrelevant. This evidence did address the two crucial issues of deprivation and whether any deprivation was likely to continue, and it was thus certainly relevant.

4. Both appellants contend that the evidence was insufficient to support the juvenile court's termination of their parental rights. Parental rights may not be terminated pursuant to OCGA § 15-11-51 (a) (2) "in the absence of a showing of parental unfitness, caused either by intentional or unintentional misconduct resulting in abuse or neglect of the child, or by what is tantamount to physical or mental incapacity to care for the child." *In the Interest of L. C. P.*, 164 Ga. App. 473-474 (297 SE2d 510) (1982); *In the Interest of A. O. A.*, 172 Ga. App. 364, 365 (323 SE2d 208) (1984). "[T]he appropriate standard of appellate review in a case where a parent's rights to his child have been severed is 'whether after reviewing the evidence in the light most favorable to the appellee, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost.'" *Blackburn v. Blackburn*, 249 Ga. 689, 694 (292 SE2d 821) (1982).

The instant case does not involve the respective parents' mere "failure fully to live up to societal norms for productivity, morality, cleanliness and responsibility . . ." *R. C. N. v. State of Ga.*, 141 Ga. App. 490, 491 (233 SE2d 866) (1977). Rather, the evidence showed that both appellants were incorrigibly unsanitary and filthy, to the undeniable detriment of their children. Financial disadvantage may present an insurmountable obstacle to escape conditions of poverty, but the appellants may not rely upon socio-economics to explain away their apparent determination to live in squalor; not only did they repeatedly over the years fail to make the slightest effort to alleviate their deplorable living conditions, but at every opportunity proceeded to aggravate them. The appellants' sloth extended not only to housekeeping, but also to obtaining medical care for the children, which was rendered necessary more often by the former, and also to making any effort to provide the least emotional or intellectual stimulation of the children so that the children's minds and personalities could develop and rise above the abysmal depths of their progenitors. There also was some evidence that at least Daphne Harding found sport in the physical abuse of her son and in watching him get stoned on marijuana. To conclude that the appellants were and continue to be incapable of maintaining a household fit for beasts, much less for babies, requires no "Solomon-like sagacity." *K. E. S. v. State of Ga.*, 134 Ga. App. 843, 844 (216 SE2d 670) (1975). Compare *In re D. H.*, 178 Ga. App. 119 (342 SE2d 367) (1986).

In summary, viewing the evidence in the light most favorable to the appellee, we find the evidence was clear and convincing that the

appellants were unfit parents, a state which resulted in the neglect of the two children. Accordingly, the juvenile court properly terminated the parental rights of both Tina Alford and Daphne Harding.

*Judgments affirmed in both appeals. Benham and Beasley, JJ., concur.*

DECIDED MAY 2, 1986.

*Jeffrey L. Grube, Diane M. Zimmerman,* for appellants.
*George Nunn,* for appellee.