73327. IN THE INTEREST OF S. G. & T. G.
(354 SE2d 640)

BIRDSONG, Chief Judge.

This is an appeal from the termination of the parental rights of

Linda Gary, the natural mother of S. G. and T. G.

The circumstances of S. G. and T. G., now ages 8 and 5, came to the attention of the Troup County Department of Family & Children Services (DFCS) in March, 1984 when the elder girl's teacher reported that S. G. talked at school about her mother and mother's friends smoking marijuana and blowing smoke in the children's faces. A few months later, a neighbor reported that S. G. said she had been sexually abused; during a private conversation with a caseworker, the child played with anatomically correct dolls and said Paul Smith "made love" to her. Paul Smith, the father of the younger girl T. G., was living with the mother and girls. The caseworker concluded from the specific details given by S. G. that she had indeed been sexually abused. Mrs. Gary was advised of this fact and warned to keep the children from Paul Smith, but she denied that Paul Smith had ever "messed with" S. G. or T. G. In October, the child came to school very upset about a fight that occurred the night before. Investigation revealed that a man and woman were visiting the home; the woman allegedly sold sexual favors, and Mrs. Gary had returned home to find the woman engaged in sexual conduct with an "older" man. Mrs. Gary called the sheriff; when the sheriff arrived Paul Smith was at the home. An argument ensued and Mrs. Gary moved out. She was again warned against having Paul Smith around the children, but she continued to deny that he had abused the older child, and stated that the older child told her he had not done it.

In January, S. G.'s school reported that the child had not returned on time after Christmas holidays; the child then contracted scabies, a skin condition, and was kept out at the school's request. Thereafter an incident occurred in which the sheriff arrested a man for possession of marijuana and "being involved with a minor male child" at a house where Mrs. Gary and the children had visited. The DFCS moved for temporary custody in January 1985, after the mother told the DFCS that she was again living with Paul Smith and that S. G. was now telling her "none of this happened about the sexual abuse, that she had just made it up." After the temporary custody hearing was scheduled, Mrs. Gary moved to Meriwether County to live with her mother and stepfather. An investigation of this home showed it offered the children no better protection than the mother had previously given them. The Troup County caseworker then learned the younger child had gone back to live with her father, Paul Smith; an investigation of this situation revealed Smith was living with another couple (it was not known if they were married) and the sleeping arrangements required him to sleep with his daughter. This was thought not to be a good situation and the child was returned to Mrs. Gary.

Upon the temporary hearing, the juvenile court found the chil-

dren to be deprived, based on some of the evidence stated above, and upon this additional testimony and evidence: When the case worker confronted Mrs. Gary with the contents of the neighbor's report of sexual abuse, Mrs. Gary said S. G. was lying and S. G. could not return to the neighbor's home. In October 1984, the social worker and S. G. sat in her car and played with anatomically correct dolls. When S. G. saw the penis on the male doll, she stated that Paul had a penis and she saw it when he tried to make love to her several times. S. G. kept trying to insert the male doll's penis in the female doll's vagina. She stated Paul tried to insert his penis in her vagina but was not able to; therefore he used fingers. S. G. moved the dolls in a manner to simulate sexual intercourse. S. G. also stated Mr. Lee had also made love to her; Mr. Lee is an insurance agent who took S. G. on weekend trips with his family. The couple involved with sale of sexual favors by the wife moved out after the incident wherein the sheriff was called; but they were allowed to return a few weeks later. At this time, Mrs. Gary's lights had been turned off and the male tampered with her meter in order to restore the electrical services in the home. As a result of his tampering, Mrs. Gary was forced to pay $100 tampering fees. This visiting couple has been known to use marijuana. Mrs. Gary was at the home of a neighbor on Hammett Road when arrests were made due to sexual offenses and drug charges of this couple. She moved to Luthersville after a fight with some neighbors and a fire occurred at her home. The court noted the DFCS would like to receive temporary custody of the children and work with Mrs. Gary in order to help her improve her parenting skills, and would like to recommend that Mrs. Gary pay $5 monthly for child support; that Mrs. Gary has been cooperative with the agency for the most part; and that the social worker thinks Mrs. Gary is confused and is pretty much a victim of circumstance. Ms. Sue Jones, S. G.'s kindergarten teacher testified that about one year ago, S. G. came to school complaining of hunger; several times she reported having no food at home. Once she stated that "Paul" had spent $200 on reefer. S. G. stated that she does not like pot because she cannot blow it out like Paul does; the talk of pot smoking lasted about 2 or 3 weeks until S. G.'s mother told her to stop the talk. S. G. functioned on an average level in kindergarten. The neighbor testified S. G. told her that Paul had gotten on top of her and made love to her; then he put baby juice on her to prevent pregnancy. She reported this statement to S. G.'s mother; Mrs. Gary said S. G. had lied. S. G. was at the neighbor's home so she could take her to be fitted for a pair of shoes, which she needed. Dr. Joseph Almand, a pediatrician testified he had treated S. G. once in his office for an EPST which is required for all medicaid patients; T. G. had to be hospitalized once for pneumonia. Joseph Gray testified he and Mrs. Gary live together. His plans were

to eventually marry her; he earned between $180 and $200 weekly; he had three bedrooms and Linda had lived with him for about two months; he also had one other female living with him. Dr. Richard Maierhofer testified S. G. was tested by him in January 1985; the tests did not indicate any particular problems educationally. S. G. indicated to him that Paul Smith had inserted his fingers in her vagina; he had attempted to use his penis, but it would not fit. S. G. also stated to him that her mother was not at home. The doctor strongly believed S. G. was telling the truth about the sexual abuse. His impression of Mrs. Gary after the one meeting was she has very poor parenting skills; there was no evidence of emotional neglect with S. G. A caseworker from Meriwether County DFCS testified concerning the time Mrs. Gary and children lived with her mother; she visited S. G. at school and interviewed her. S. G. stated that her uncle was sexually abusing her and another 9-year-old child in the home of Mrs. Gary's mother. There was a lot of drinking (alcohol) in the home where S. G. was at that time living, and there were also frequent visits by a lot of men. Due to the reports about the home, Meriwether DFCS could not recommend this home as a placement for S. G. The police stated they make frequent visits to the home because of domestic problems; neighbors also indicated problems in the home. Mrs. Gary testified she had lived in a trailer park for about seven weeks. She loved her children; when the alleged child molestation took place, she was working. S. G. was (at the time of the temporary custody hearing) in school in Luthersville and living with her mother temporarily. Mrs. Gary testified she is not working and would be able to take care of the children. Paul took T. G. from Mrs. Gary and refused to return her until Saturday; she did not think Paul molested S. G. She also testified she was laid-off her previous job and had applied for jobs at several places. She planned to continue to live with Joseph Gray, but she was unsure about marrying him; at that time, he was legally married to another lady. S. G.'s natural father was presently avoiding law enforcement agencies. (This concluded the additional findings of the trial court at the temporary custody hearing.)

Thereupon, S. G. and T. G. were remanded from Mrs. Gary's home and placed in foster care. In the succeeding year until in March 1986, Mrs. Gary moved seven times. It was shown she had no training, no skills and no transportation. The DFCS established "barriers" which she must overcome to regain custody of T. G. and S. G., including finding a job and becoming financially independent so she did not have to rely on men to support her and the children, and establishing a suitable home. She did none of those things and rarely attended parenting classes as required by the DFCS. She did look for work and managed to obtain jobs such as working at a fast food restaurant, but was handicapped by her lack of training and lack of

transportation and these employments did not last. During this time she again moved in with Paul Smith and briefly lived with him before returning to her mother's house. She also lived briefly with a girl friend, a stepsister in a trailer park, and her brother. The DFCS provided twice-monthly visits with her children at the DFCS office; She cancelled three of these visits, including on one occasion to visit a relative in the hospital. Paul Smith, and sometimes other men, drove her to these visits. During this year, Mrs. Gary also presented a problem to the DFCS and the foster home, by calling the girls once or twice weekly and keeping them confused and upset by telling them she was coming to get them, thus interfering with their stability at the foster home. She called the caseworker and was "hostile" on at least one occasion, and threatened to get a lawyer and regain custody of her children and return to Paul Smith, who would take care of them. It was observed that during the visits, the mother played with the girls, and it was "a happy time," but the girls exhibited behavior problems after each visit. On one occasion Mrs. Gary was allowed to take the girls out of the office for a few hours' visit, and took them to her mother's house where Paul Smith was present. In October 1985, S. G. began to talk at school about being sexually abused. The school counselor also stated S. G. talked about throwing herself down the stairs and saying that she ought to "stick a knife in my belly [to] get rid of all the hurt. It would be better than letting my cry pour out." She was upset and confused about why she was placed in a foster home. The counselor concluded from counseling and from pictures the child drew, that S. G. had indeed been sexually abused by someone; the counselor concluded that the crucial problem was Mrs. Gary's refusal to believe Paul Smith had abused the child. When the DFCS advised the mother they would seek to terminate her parental rights, she cried and it was the child who comforted her, in a role reversal, further indicating her unsuitability and instability to function as the parent.

At the termination hearing, it was not shown the mother had a plan for establishing a stable home for T. G. and S. G., nor anywhere to go except her mother's (where, there was evidence, a step-uncle of Mrs. Gary had sexually abused another child, and perhaps S. G. as well) and Paul Smith's. Mrs. Gary testified she loved her children, and intended to "do better"; she testified further that S. G. still told her it was not Paul Smith who had abused her, but it was Mrs. Gary's step-uncle, James Coursey.

In consideration of all these matters of record, the trial court made specific findings of fact and found: "Ms. Gary is unemployed, has paid no support for her children's benefit prior to the panel case review in which she was informed of Petitioner's decision to seek this termination, has not obtained suitable housing or any sort of stable

residence, does not believe that Paul Smith sexually molested [S. G.], and continues to see Paul Smith, and has not attended parenting classes as requested by Petitioner with the exception of two classes attended after the Petition for Termination was filed." The court concluded: "[T]he children are deprived children in that they are without proper parental care or control, subsistence, and other care or control necessary for their physical, mental, and emotional health. In addition, the Court finds by clear and convincing evidence that the conditions and causes of the deprivation are likely to continue and will not be remedied, and that by reason thereof, the children have suffered, and, if parental rights are not terminated, would probably suffer serious physical, mental, moral or emotional harm." Thereupon the court terminated as to both S. G. and T. G. the parental rights of the mother, of Paul Smith the father of T. G., and Anthony Allen Gary, the father of S. G. This appeal is by the mother. *Held*:

OCGA § 15-11-81 (a) and (b) requires the trial court in considering whether to terminate parental rights to first determine whether there is "present, clear and convincing evidence of parental misconduct or inability . . . by finding [b (4) (A)] . . . that the child is a deprived child. . . . The lack of proper parental care or control by the parent . . . is the cause of the child's status as deprived. . . . Such cause of deprivation is likely to continue or will not likely be remedied; and . . . the continued deprivation will cause or is likely to cause serious physical, mental, emotional or moral harm to the child." In determining whether the child is without proper parental care and control, the court shall consider, without limitation, physical, mental or emotional neglect of the child (OCGA § 15-11-81 (b) (4) (B) (v)). In addition, where the child is not in the custody of the parent who is the subject of the proceedings, in determining whether the child is without proper parental care and control, the court shall consider, without limitation, whether for a period of one year or longer prior to the filing of the termination petition, the parent without justifiable cause failed to provide for the care and support of the child as required by law or judicial decree; and to comply with a court-ordered plan designated to reunite the child with the parent. OCGA § 15-11-81 (b) (4) (C) (ii), (iii).

If there is clear and convincing evidence of such parental misconduct or inability, the court shall then consider whether termination is in the best interests of the child, after considering the physical, mental, emotional and moral condition and needs of the child, including the need for a secure and stable home. OCGA § 15-11-81 (a).

When the court below has made a determination to terminate parental rights, the appropriate standard of appellate review is " 'whether, after reviewing the evidence in the light most favorable to the appellee, any rational trier of fact could have found by clear and

convincing evidence that the natural parents' rights to custody have been lost.'" *Blackburn v. Blackburn*, 249 Ga. 689, 694 (292 SE2d 821); *In re K. H.*, 179 Ga. App. 4, 9 (345 SE2d 108). After giving the record in this case a full and sifting consideration, according to the standard just stated, we are satisfied the judgment in this case is sustained by clear and convincing evidence that this mother's parental rights in her children have been lost. In the period following the placement of T. G. and S. G. in foster care, the appellant made no progress towards establishing a stable home and removing herself for her children's sake from financial and domestic dependence upon the father of one of the children, who was determined to have sexually abused the other; and moreover, she offered no plan or course of endeavor suggesting she could in any manner establish a home for S. G. and T. G. away from that person and away from her mother's house found by the trial court to have a history of child molestation. Any rational trier of fact could find clear and convincing evidence in this case that the causes and conditions of the deprivation of these children "are likely to continue and will not be remedied, and that by reason thereof, the children have suffered, and, if parental rights are not terminated, would probably suffer serious physical, mental or emotional harm," as the trial court found.

*Judgment affirmed. Banke, P. J., and Sognier, J., concur.*

DECIDED FEBRUARY 23, 1987 —
REHEARING DISMISSED MARCH 11, 1987.

*Marc E. Acree*, for appellant.
*Louis J. Kirby, Michael J. Bowers, Attorney General, David C. Will, Assistant Attorney General*, for appellee.