A04A1573. IN THE INTEREST OF T. R., a child.
(606 SE2d 630)

ADAMS, Judge.

The mother of T. R. appeals a juvenile court order in which the child was held to be deprived. She claims the trial court erred by failing to grant a continuance of the deprivation hearing, by failing to disqualify counsel for the natural father, and by finding sufficient evidence to support the ruling.

1. The mother contends that the trial court abused its discretion by denying her motion for a continuance at the beginning of the deprivation hearing.

A juvenile court has the authority to grant a continuance of a properly set deprivation hearing, for good cause, even beyond the statutory limitations for the time of the hearing. Uniform Juvenile Court Rule 11.3. See also *In the Interest of L. A. E.*, 265 Ga. 698, 700 (462 SE2d 148) (1995) (continuance of adjudicatory hearings expressly provided by Juvenile Court Rules). A trial court's decision to

grant or to deny a continuance will not be disturbed absent abuse of discretion. *In re K. H.*, 179 Ga. App. 4, 8 (1) (345 SE2d 108) (1986). Finally, the party seeking a continuance must show due diligence. OCGA § 9-10-166.[1]

The child was taken into custody shortly before January 22, 2004, pursuant to a complaint alleging deprivation, and a shelter care hearing was held on that day. At the end of the hearing, the court placed temporary legal and physical custody of the child in the Department. At that hearing, the court advised the mother that if she was unable to hire an attorney, the court would appoint one to represent her at no cost. The mother indicated that she planned to hire an attorney. At the end of the hearing the juvenile court judge advised the mother to report by the following Wednesday (six days later) whether she had an attorney, and if not, the court would appoint one for her. But the mother did not report to the court or hire an attorney until February 4, one day prior to the adjudicatory hearing. Her attorney moved for a continuance at the beginning of that hearing on the grounds that he had not had time to prepare.

Given the mother's delay in finding an attorney, we find no abuse of discretion by the juvenile court judge.

2. The mother contends that the trial court erred by denying her motion to disqualify counsel for the father. The father intervened in the deprivation matter in an effort to convince the court that the child should be placed with him instead of the mother. The father's counsel, who had represented the father in custody matters involving the child against the mother for several years, occasionally represents Ware County Department of Children and Family Services (DFACS) as a Special Assistant Attorney General (SAAG). The mother necessarily implies that the father received improper assistance in his effort to obtain custody of the child.[2]

The mother "has failed to cite any case law or statute providing that an attorney's part-time service as a SAAG would result in an automatic conflict of interest with respect to private clients, and our research reveals none." *Petty v. State*, 260 Ga. App. 38, 41 (2) (a) (579 SE2d 23) (2003). In *Petty*, this Court held that a person must demonstrate an actual conflict of interest affecting the performance of a lawyer who works as a part-time SAAG, not just the mere

---

[1] See also Uniform Juvenile Court Rule 7.7 (OCGA § 9-10-150 et seq. applicable to the request for continuance in this case).

[2] The mother also appears to argue, on behalf of the father, that he could not receive proper assistance of counsel because he took a position adverse to DFACS in this case and his counsel represented both parties. But she has no standing to raise this ground because it is " 'available only to those as to whom the attorney in question sustains, or has sustained, the relation of attorney and client.' [Cit.]" *State v. Redd*, 243 Ga. App. 809, 813 (3) (a) (534 SE2d 473) (2000).

possibility of a conflict. Id. Here, there was no evidence that the father's counsel had ever represented DFACS with regard to T. R. or any relatives, no evidence that the father's counsel exploited his public office for the advantage of a private client, and no evidence that he had access to confidential government information about the matter at hand. The mother's reliance on Rules 1.11 and 1.7 of the Georgia Rules of Professional Conduct is not well founded for the same general reasons. See generally Georgia Rules of Professional Conduct, Rules 1.11; 1.7. We find no error.

3. Finally, the mother contends that the evidence was insufficient to support the finding of deprivation.

At the deprivation hearing the following evidence was presented. Appellant/mother A. M. and B. S. R. were divorced in 1994 after having two children, T. R. and B. S. R., Jr. Since the time of the divorce the mother has had custody of the children for all but five months. Both parents have remarried and had additional children. The mother married B. M., and the couple had one child together. They are now divorced, and the mother has custody of their child, D. M.

A. M. and her first husband, B. S. R., have been involved in a ten-year custody battle for their two children. On January 26, 2001, in connection with one of the custody disputes, the Superior Court of Ware County, in a final order, returned custody of T. R. and B. S. R., Jr. to the mother following the five-month period in which custody had been placed with the father. The superior court order also provided that T. R. and her brother were not to have contact with B. M., their former stepfather, and that B. M. was not to come to their home. The court also concluded that "there has not been a change in conditions affecting the welfare of the children which [sic] will warrant a change of custody."

The mother testified that for 18 months, she complied with the order but that for the subsequent 18 months she allowed B. M. to have contact with the children in violation of the order. The natural father admitted knowing for a long time that B. M. was having contact with his children, but he denied ever giving the children permission to do so. The mother explained that the children wanted to go with their former stepfather on fun outings in order to spend time with their half-brother, D. M. But there was evidence that T. R. and her brother despised their former stepfather except when they wanted something from him. Also, the evidence showed that at some point the former stepfather began to come to the house every weekend. The mother explained that he was trying to maintain a relationship with their mutual son.

In early January 2004, the mother heard from several family members or friends that T. R. had been molested by her former stepfather, B. M. She picked T. R. up and they discussed the incident

during a car ride. The order of what was discussed in that conversation is not clear from the transcript, but the mother testified to the following dialogue. She asked T. R. if B. M. had been "messing with her," whether he had touched her breasts or vagina, and if he had tried to have sex with her. T. R. said "no" but demonstrated that B. M. had put his hand on the inside of her pants massaging her back and said that he had rubbed his hand on her leg. The mother testified that the child did not say that her former stepfather had touched her buttocks. The mother concluded that the child had not been touched sexually. The mother told T. R. that if B. M. had done something sexual that they needed to go to the police right away. She claimed she told the child to be honest: "If he done something to [you], I want him to go to jail, If he hadn't done something to [you], then I wouldn't want him to go to jail."

The mother testified that the child replied that she did not want to go to the police department and that the mother should just break up with B. M. and not let him come around. (It was suggested that the child had a previous benign but frightening experience involving police and firemen.) The mother testified that she replied, "you do not just break up with people if they are molesting your children, they go to jail. . . ." The mother then agreed not to let B. M. come around the child again and claims to have followed through on that. According to the mother, she did not want family members to discuss the matter or for the matter to be spread around at school, so she also told T. R., "If anybody asks you anything, just tell them it's none of their business. Try not to spread idle gossip." The mother confronted B. M. She testified that B. M. told her that he had only touched the girl on the inside of the thigh. The mother admits that she never sought professional help sorting out the child's allegations and that she did not report the incident to the authorities.

Within one week DFACS was made aware of the allegations by someone else, and DFACS contacted the police. Detective Teresa Grant of the Waycross Police Department interviewed T. R., who told the officer that on ten to fifteen occasions, B. M. had put his hand down inside her pants and rubbed her buttocks and that he had touched her in the crotch area on the outside of her clothing. The child said that the incidents had occurred during the Christmas holidays in 2003 and had ended on January 1, 2004. Detective Grant also spoke to the mother. The mother admitted that she told the child that if B. M. went to jail, that she, the mother, could go to jail, too. (Although she did not mention it to the child, the mother was referring to breaking the order that prohibited contact between B. M. and the children.) The mother admitted that she told the child not to talk about the incident with anyone, but she claimed that she meant only family members, not the authorities. The major difference between what the mother and

daughter told the police was the description of the severity of the alleged touching. Otherwise, the mother confirmed each thing that the child told the detective, including the mother's statement that they should go directly to the police, that the child did not want to, and that the mother agreed to keep B. M. away from the home.

The mother also told the detective that there had been an argument the day before the report of the incident, in which B. M. pushed B. S. R., Jr., into a wall. T. R. then told her mother, "You're gonna [sic] end up losing your kids because I'm not gonna [sic] keep this inside no more." The mother testified that if the allegations are true about there being ten or fifteen incidents, she does not understand why her daughter did not tell her earlier.

Despite the fact that the mother and daughter gave the detective very similar information, Detective Grant felt like the mother had been trying to cover up B. M.'s behavior by telling the 11-year-old child not to say anything to anyone and telling the child that she, the mother, could go to jail because of the incident. Detective Grant testified that the mother was "putting a child in a position to make a decision that she's not capable of making."

Detective Grant testified that although B. M. was under investigation, as of the date of the deprivation hearing, February 5, 2004, he had not been arrested for the incident.

Dedra Stephens of Advantage Counseling Services performed a home evaluation of the natural father at the request of DFACS. The home passed inspection and was approved. Stephens was not asked to evaluate any other homes.

The mother testified that the child wanted to live with her and not with her father. The guardian confirmed that the child was not happy about the prospect of living with her father. The father did not participate in the child's sports activities, and the child said that her father was occasionally mean to her. The mother testified that she has known the father to drink heavily and to use illegal drugs but her knowledge was based on their relationship, which ended ten years earlier.

The father admitted that he had not seen the child for four months prior to the hearing because the child did not want to visit and that he did not go to the child's ball games. Although he initially denied any involvement with illegal substances, he later admitted heavy use of alcohol and drugs but testified that he stopped both about ten years earlier.

In the event the court should determine the child was deprived, DFACS recommended that the judge determine the placement; the guardian and the mother recommended placement with the Department; the father recommended placement with himself. The court found the child deprived and placed custody with the father.

"On appeal from a juvenile court's order finding deprivation, we review the evidence in the light most favorable to the juvenile court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the [child was] deprived." (Citations and punctuation omitted.) *In the Interest of G. G.*, 253 Ga. App. 565 (560 SE2d 69) (2002). We do not judge the credibility of witnesses or weigh the evidence. Id.

Construed in favor of the judgment, a rational trier of fact could have found clear and convincing evidence that the mother disobeyed a court order and allowed her children to have contact with their former stepfather; the former stepfather then molested the child; and the mother tried to cover up the incident by telling the 11-year-old child not to say anything to anyone and that she, the mother, could go to jail because of the incident. The juvenile court was authorized to disbelieve the mother's explanations for her behavior. A child is deprived if, among other things, the child is without proper parental care or control necessary for the child's physical, mental, or emotional health or morals. OCGA § 15-11-2 (8) (A). "The juvenile court's primary responsibility is to consider and protect the welfare of children whose well-being is threatened. OCGA § 15-11-1 (1)." *In the Interest of B. H.*, 190 Ga. App. 131, 133 (1) (378 SE2d 175) (1989). "This is so regardless of specific fault on the part of the mother. [Cits.]" Id. The evidence was sufficient to support the finding.

With regard to placement, the trial court heard testimony that the father's home was suitable for the temporary placement and such placement is authorized under the law. OCGA § 15-11-55 (a). We find no error.

*Judgment affirmed. Ruffin, P. J., and Eldridge, J., concur.*

DECIDED NOVEMBER 10, 2004.

*Hatfield & Hatfield, Thomas E. Hatfield*, for appellant.
*Thurbert E. Baker, Attorney General, William C. Joy, Shalen S. Nelson, Senior Assistant Attorneys General, Laura W. Hyman, Assistant Attorney General, John D. Staggs, Jr.*, for appellee.