**FIRST DIVISION**
**BARNES, P. J.,**
**MCMILLIAN and REESE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**January 22, 2019**

# In the Court of Appeals of Georgia

A18A1933. REID v. LINDSEY.

REESE, Judge.

In this grandparent visitation case, John Mitchell Reid, Jr., the father of D. R., a 12-year-old boy, appeals from the trial court's order granting visitation with D. R. to Reid's mother, Vickie Lindsey. Reid contends that the trial court's findings of fact were not supported by clear and convincing evidence, that the court erred in ruling that Lindsey's visitation had priority over D. R.'s extracurricular activities, and that it erred in ordering Reid to pay a portion of the Guardian ad Litem's fees. For the reasons set forth, infra, we affirm the court's order as to its award of visitation to Lindsey, but reverse the court's order requiring Reid to pay a portion of the Guardian ad Litem's fees.

Viewed in the light most favorable to the trial court's judgment,[1] the evidence showed the following facts. D. R. and his twin brother, J. R., were born to Reid and his first wife, Sherry, in December 2005. J. R. was born with serious medical issues that required numerous surgeries and prolonged periods of hospitalization in Atlanta. As a result, Sherry Reid was usually at the hospital with J. R., and Reid had to work and take care of their other children at home. Given these circumstances, Lindsey and her husband[2] (collectively, "the grandparents") offered to take care of D. R. in their home. Over the next ten years, D. R. lived almost exclusively in the grandparents' Cherokee County home, although he often visited his father and the rest of his family. Further, during that ten-year period, Reid and his family sometimes also lived in the grandparents' home (hereinafter, "Lindsey's home") due to Reid's financial difficulties and J. R.'s frequent hospitalizations.

From 2006, when D. R. began living in Lindsey's home, until May 2016, his grandparents provided almost all of his financial support, and Lindsey home-schooled D. R. and made most of the decisions concerning his care. The grandparents enrolled

[1] See *Keith v. Callahan*, 332 Ga. App. 291, 291 (772 SE2d 386) (2015).

[2] Lindsey's husband, who is Reid's step-father, was not a party to the petition at issue, nor is he a party to this appeal. See OCGA § 19-7-3 (a) (2) (defining "grandparent" as "the parent of a parent of a minor child[ ]").

D. R. in sports programs and music lessons, routinely took him to church, and often took him to college and professional football and baseball games, to theaters and museums, and on out-of-state trips.

In August 2011, when D. R. was five years old, his mother suddenly and unexpectedly died. The grandparents purchased a home near theirs for Reid and J. R. to live in, although D. R. continued to live with his grandparents. Reid remarried shortly after his first wife's death, but he and his second wife divorced about a year later. Then, in 2015, Reid married again, and he and his wife, Nicky, had a daughter, K. R.

In May 2016, Reid moved D. R. out of Lindsey's home and into his home ("Reid's home") to live full-time with him, his wife, D. R.'s twin brother, J. R., and his half-sister, K. R. Reid also notified Lindsey that she would not be allowed any visitation or phone contact with D. R. unless he (Reid) was present.

On May 31, 2016, Lindsey filed a petition against Reid seeking primary custody of D. R. and child support.[3] She subsequently amended the petition to include a request for reasonable visitation with D. R. as an alternative to custody and child

---

[3] The issue of Lindsey's custody or visitation with Reid's other biological children, J. R. and K. R., was not raised in the petition, nor is it an issue on appeal.

support. In February 2017, the trial court conducted a hearing, during which Lindsey focused solely on her request for visitation with D. R., stating that she was not asking for custody at that time. Following the hearing, the court issued a temporary order in which the court made the following findings of fact.

According to the court, in the nine months that had passed between May 2016, when Reid moved D. R. out of Lindsey's home, and the date of the temporary hearing, D. R. had been "happy, loved, and well cared for" by Reid; enjoyed many new activities with his father; had a "close and warm loving relationship" with all of his family members; appeared to feel like he was part of the family; and did not want to stop living with his father.

Even so, the court found that, in the ten years between D. R.'s birth in December 2005 and May 2016, Lindsey had been D. R.'s primary physical custodian; provided almost all of D. R.'s financial support; met all of his "health, dental, education, social, and moral needs[;]" provided D. R. with family vacations, celebrations for special events and holidays, and numerous extracurricular and cultural activities; and ensured that D. R. had ongoing contact with his twin brother, J. R., and other members of his family and step-families. The court found that, during

4

this time, Reid had "made no meaningful assertion of his parental rights [and] agreed to and supported [Lindsey] raising [D. R.]"

The court found that, as a result of Lindsey's consistent and stable parental care and support of D. R. throughout his childhood, D. R. was "very bonded with [Lindsey] and her husband." The court found, however, that Reid had "prevented reasonable contact between [D. R.] and [Lindsey]" during the nine months that had passed since Reid removed D. R. from Lindsey's home. According to the court, D. R. had already experienced significant loss during his childhood, including the death of his mother, the separation of him from his family due to the substantial medical needs of his twin brother, the loss of his relationship with his former step-mother and step-siblings, and his sudden removal from Lindsey, "his primary caregiver of ten (10) years[.]" The court found that, as a result, "[c]ontinued removal from [Lindsey] would be another traumatic loss and harmful to [D. R.]."

Based upon these findings of fact, the trial court concluded that there was clear and convincing evidence that D. R. would be harmed if he was denied contact with Lindsey and that such contact was in D. R.'s best interests. As a result, the court awarded Lindsey visitation with D. R. on weekends (subject to his scheduled

5

extracurricular activities) and for two weeks of uninterrupted visitation during summer vacation, as well as permission for Lindsey to call D. R. three times a week.

In the months after the March 2017 temporary order took effect, however, several issues arose between the parties that significantly interfered with or prevented Lindsey's visitation with D. R. For example, Reid enrolled D. R. in various baseball, basketball, and other sports programs that required D. R. to attend training sessions and/or games for several hours almost every weekend. The hours of these activities varied and sometimes changed at the last minute. The activities also required Lindsey to drive several miles to the sports venue to drop off D. R. and then wait until he was finished. As a result, Lindsey was often prevented from making other plans for her visitation with D. R. Further, Lindsey's visitation during school breaks and summer vacation were hampered or prevented altogether because of sports activities or because Reid made alternative plans for D. R.

In early 2018, the court conducted a final hearing on Lindsey's petition, after which it issued the final order in which it expressly adopted and incorporated its findings of fact from the March 2017 temporary order, with one exception. The court modified the prior fact findings as to Reid's involvement with D. R. while the child lived with Lindsey, finding that Reid had maintained an ongoing relationship with

6

D. R. during this period and had visited the child regularly, and that D. R. briefly resided in Reid's home at some point. The court also found that Reid had provided some financial support for D. R. and that, when the child was with him, Reid had provided for the child's basic needs. Still, according to the court, "[a]lthough [Lindsey] did not exclusively raise [D. R.] for ten (10) years, she did provide the majority of parenting. [Reid] allowed [Lindsey] to provide all financial support of the child throughout most of [the child's] life[,] as well as [make] the majority of parental decisions."

In addition, the court expressed concern about the conduct of Reid and D. R. toward Lindsey since the temporary order took effect, specifically the "high conflict visitation exchanges between the parties; disrespectful actions of [D. R.] towards [Lindsey]; rescheduling of visitations; [Reid's] denial of Court[-]Ordered visitations; [Reid's] unreasonable interference with [Lindsey's] visitations; and [Reid's] significantly increasing [D. R.'s] activities[.]"[4]

In addressing D. R.'s relationship with Lindsey, the court found that D. R. had an important relationship with Lindsey, that Lindsey had had "a significant impact" on the child's life, and that, "for many years, the child viewed her in a parental role."

_____

[4] See Division 2, infra.

According to the court, D. R. had "experienced tragic loss and much instability in his life[,]" and Lindsey had been "a consistent and stable parental figure" for him. The court found that D. R. and Lindsey had "a strong emotional bond [that was] important to the child's welfare[,]" that denial of visitation with Lindsey would harm D. R., and that a set, mandatory visitation schedule was in D. R.'s best interests, because he would then "know what to expect."

Based upon these facts, which the trial court found were supported by clear and convincing evidence, the court concluded that a set visitation schedule that provided for regular, exclusive visitation with Lindsey was in D. R.'s best interests and that denial of such visitation would harm D. R.'s welfare. As a result, the trial court granted Lindsey visitation with D. R. for a minimum of one weekend each month, two weeks during D. R.'s summer vacation, a portion of his school breaks, and various holidays, subject to certain conditions involving his extra-curricular activities.[5] It is from this order that Reid filed the instant appeal.

In reviewing an order granting grandparent visitation, we view the evidence in the light most favorable to the trial court's judgment to determine whether any rational trier of fact could have found by clear and convincing evidence that the mandated visitation was authorized.

_____

[5] See Division 2, infra.

8

[I]n doing so, we do not weigh the evidence or determine witness credibility, but defer to the trial court's factfinding and affirm unless the evidence fails to satisfy the appellate standard of review.[6]

With these guiding principles in mind, we turn now to Reid's specific claims of error.

1. Reid contends that the trial court erroneously failed to make specific findings of fact, based on clear and convincing evidence, that D. R.'s health and welfare would be harmed unless visitation was granted or that visitation would be in the child's best interests.[7] We disagree.

---

[6] *Keith*, 332 Ga. App. at 291-292 (citation and punctuation omitted).

[7] We note that, to the extent Reid relies on constitutional due process requirements that apply to the termination of parental rights and that mandate a showing of *parental unfitness* by clear and convincing evidence before a child can be *permanently removed* from his or her parent's custody, such requirements are clearly inapplicable here, as this case does not involve the permanent removal of D. R. from Reid's custody or the termination of Reid's parental rights. Cf. *Blackburn v. Blackburn*, 249 Ga. 689, 692-693 (2) (292 SE2d 821) (1982) (In holding that the trial court erred in terminating a parent's custody and granting permanent custody of the child to a grandparent in the absence of clear and convincing evidence that the parent was unfit, the Court explained that, "where a third party sues the custodial parent to obtain custody of a child and to terminate the parent's custodial rights in the child, . . . the parent is entitled to custody of the child unless the third party shows by 'clear and convincing evidence' that the parent is unfit or otherwise not entitled to custody[. Because] freedom of personal choice in matters of family life is a fundamental liberty interest protected by the United States Constitution, . . . the Due Process Clause of the Fourteenth Amendment demands that before a [S]tate may sever the rights of parents in their natural child, the [S]tate must support its allegations 'by *at least* clear and convincing evidence.' Requiring that the trial court find 'clear and convincing

When a minor child is not living with both of his parents because the parents are separated or, as in this case, one of the parents has died, the child's grandparent has the right to file an original action for visitation with the child pursuant to OCGA § 19-7-3,[8] which is commonly referred to as the "Grandparent Visitation Statute."[9] The Georgia General Assembly enacted the statute "to provide a mechanism for courts to grant a grandparent visitation rights with his or her minor grandchild, where, as here, a child's parent objects. In this regard, the statute codified a standard for the trial courts to utilize in balancing the wishes of an alienated grandparent, the rights of the parents, and the interests of the child."[10] The statute provides as follows:

---

evidence' of a parent's unfitness prior to terminating the parent's rights in his child reflects the value society places on the freedom of personal choice in matters of family life and the judgment society makes about how the risk of error should be distributed between the litigants. Demanding that this high burden of proof be met furthers the State's legitimate interest in protecting the child, yet forestalls arbitrary State interference with the integrity of the family unit. It also reduces the possible risk that a factfinder might decide to deprive an individual of the rights to his child based solely on a few isolated instances of unusual conduct or idiosyncratic behavior.") (citations and punctuation omitted; emphasis in original).

[8] OCGA § 19-7-3 (b) (1) (A), (b) (2).

[9] *Sheppard v. McCraney*, 317 Ga. App. 91, 92 (730 SE2d 721) (2012).

[10] Id. (citations and punctuation omitted).

10

Upon the filing of an original action [for visitation], the court may grant any family member of the child reasonable visitation rights if the court finds by *clear and convincing evidence* that the *health or welfare of the child would be harmed unless such visitation is granted and if the best interests of the child would be served by such visitation*. The mere absence of an opportunity for a child to develop a relationship with a family member shall not be considered as harming the health or welfare of the child *when there is no substantial preexisting relationship between the child and such family member*. In considering whether the health or welfare of the child would be harmed without such visitation, *the court shall consider and may find that harm to the child is reasonably likely to result when, prior to the original action or intervention:*

(A) *The minor child resided with the family member for six months or more*;

(B) *The family member provided financial support for the basic needs of the child for at least one year*;

(C) *There was an established pattern of regular visitation or child care by the family member with the child*; or

(D) Any other circumstance exists indicating that emotional or physical harm would be reasonably likely to result if such visitation is not granted.

The court shall make specific written findings of fact in support of its rulings.[11]

---

[11] OCGA § 19-7-3 (c) (1) (emphasis supplied).

Further, the statute provides that,

> [w]hile a parent's decision regarding family member visitation shall be given deference by the court, the parent's decision shall not be conclusive when failure to provide family member contact would result in emotional harm to the child. *A court may presume that a child who is denied any contact with his or her family member or who is not provided some minimal opportunity for contact with his or her family member when there is a preexisting relationship between the child and such family member may suffer emotional injury that is harmful to such child's health.* Such presumption shall be a rebuttable presumption.[12]

(a) As an initial matter, in arguing that the trial court failed to make specific findings of fact in support of its award of visitation, Reid has misrepresented the court's final order by ignoring all of the order except for the court's ultimate conclusion, i.e., that D. R. would be harmed if visitation was denied and that such visitation was in D. R.'s best interests. As shown above, in the temporary order, the court made numerous factual findings based on the clear and convincing evidence presented. And, in the final order, the court expressly incorporated the findings of fact from the temporary order and made additional fact findings based on what had occurred with D. R. and the parties since the temporary order was issued. Thus,

---

[12] OCGA § 19-7-3 (c) (3) (emphasis supplied).

Reid's claim that the court's ruling was based solely on "[b]road, conclusory statements" is entirely without merit.[13]

(b) At issue, then, is whether the trial court erred in finding that Lindsey, as the petitioning family member, had met her burden of presenting "clear and convincing evidence that the health or welfare of [D. R.] would be harmed unless visitation was granted, and [that D. R.'s] best interests would be served by allowing such visitation."[14]

(i) *Whether the denial of visitation would harm D. R.* In this case, OCGA § 19-7-3 (c) (1) expressly authorized the trial court to find that a denial of visitation was reasonably likely to harm D. R.'s health or welfare because D. R. lived with Lindsey

---

[13] See *Luke v. Luke*, 280 Ga. App. 607, 610-611 (2) (634 SE2d 439) (2006); cf. *Rainey v. Lange*, 261 Ga. App. 491, 492 (1) (583 SE2d 163) (2003) (The trial court's grandparent visitation order failed to show that it applied the clear and convincing evidence standard and, instead, stated only as follows: "Given the allegations the parents have raised against each other (but without making a finding as to the truth or falsity of any of the allegations), the [c]ourt finds that enough issues have been raised that visitation with the maternal grandparents is in the child's best interests and will promote the child's well-being and avoid harm to the child's welfare, by way of providing a system of checks and balances." In vacating the order and remanding the case to the trial court, this Court held that "[t]his broad conclusory statement fails to set forth *specific* findings of fact supporting the trial court's grant of grandparent visitation which would enable this Court to conduct an intelligent review of the merits of this case.") (citation and punctuation omitted; emphasis in original).

[14] *Sheppard*, 317 Ga. App. at 92-93 (citations omitted).

13

for six months or more,[15] and Lindsey provided child care and all of D. R.'s financial support for at least one year.[16] Further, given the undisputed evidence that there was a "preexisting [ten-year] relationship between [D. R.] and [Lindsey]," the court was authorized to presume that D. R. might suffer an "emotional injury that [was] harmful to [his] health" if he was denied at least minimal contact with Lindsey.[17] It was Reid's burden to rebut such presumption.[18]

In arguing that the trial court erred in finding that there was clear and convincing evidence that D. R. would be harmed if visitation was denied,[19] Reid

---

[15] See OCGA § 19-7-3 (c) (1) (A).

[16] See OCGA § 19-7-3 (c) (1) (B), (C).

[17] See OCGA § 19-7-3 (c) (3).

[18] See id.

[19] To the extent Reid relies, in his reply brief, on the Supreme Court of Georgia's recent opinion in *Patten v. Ardis*, 304 Ga. 140 (816 SE2d 633) (2018), holding that OCGA § 19-7-3 (d) is unconstitutional, that subsection of the statute is clearly inapplicable to the instant case, because Lindsey is *Reid's* parent, not the parent of D. R.'s deceased biological mother. See *Patten*, 304 Ga. at 144-145 (3) (Under OCGA § 19-7-3 (d), when a child's parent was dead, incapacitated, or incarcerated, the trial court had the discretion to award visitation to the parent of the deceased, incapacitated, or incarcerated parent without requiring clear and convincing evidence that the child would be harmed absent visitation. The Supreme Court ruled that, because the provision did not require a showing of harm, it was unconstitutional.).

relies primarily on testimony presented during the temporary hearing, specifically the testimony of a counselor who started seeing D. R. weekly for "grief counseling" in October 2016, about five months after Reid removed D. R. from Lindsey's home. According to the counselor, before she had her first session with D. R., she met with Reid and his wife to get the child's history and find out about the problems they thought should be addressed. Reid told her that he thought grief counseling would be beneficial for D. R. because D. R.'s mother had died in 2011, when D. R. was only five years old and, thus, was too young for such counseling. The counselor met with D. R. for 15 weekly sessions between October 2016 and the February 2017 temporary hearing.

During the temporary hearing, the counselor testified that, at some point while she was counseling D. R., D. R. learned that Lindsey was seeking custody of him, and he began expressing "a great deal of anxiety and discomfort" because he believed that he was going to "lose his father" like he lost his mother and was going to be forced to live with Lindsey. According to the counselor, D. R. had not exhibited any grief or emotional trauma from being separated from Lindsey; instead, he indicated that he felt misled, "baffled," and betrayed by Lindsey, said he did not want to see Lindsey, and exhibited "[p]hysical signs of anxiety" when he talked to her about Lindsey. The

15

counselor also testified that D. R. had threatened to run away or kill himself if he was forced to visit or live with Lindsey. Thus, in her opinion, "forced" visitation with Lindsey would be "emotionally damaging" to D. R.

In contrast to the counselor's testimony, however, a Guardian ad Litem ("GAL") appointed by the court testified during the final hearing that she had serious concerns about the counseling D. R. had received, expressing her scepticism about the counselor's report of all of the "horrible things" Lindsey allegedly had said to D. R. and the counselor's conclusion that visitation would be harmful to D. R. The GAL pointed out that the "counselor came in long after [D. R.] had been with [Reid] in his household for a considerable length of time and [there had] been no contact with [Lindsey]." She testified that, in similar cases, one typically found that the child's anxiety had decreased because they had not been exposed to the person seeking visitation and, as a result, the child became more calm about the situation. According to the GAL, however, the counselor claimed the reverse had happened in this case, i.e., "the longer [D. R.] was away from his grandparents, the more in fear of his grandparents [the] child was becoming."

The GAL also accused Reid of creating meritless excuses in order to prevent D. R. from spending time with Lindsey after the temporary order was issued; she

testified about several ways that Reid had intentionally alienated D. R. from Lindsey; and she gave her opinion that Reid was "more interested in punishing the grandparents versus doing what [was] best for [D. R.]." In addition, the GAL testified about the negative effect D. R.'s numerous sports activities had on Lindsey's visitation, stating that D. R. and Lindsey had no "quality time" together and were unable to do the activities that he had grown up doing because the manner in which they spent the visitation periods was "dictated by [D. R.'s] extracurriculars[.]" The GAL testified that she believed it was unreasonable for Lindsey to "have to spend [eight] plus hours on baseball fields every time" she had visitation with D. R., and recommended that Lindsey have visitation for one weekend per month, and at least two weeks during the summer, without being required to accommodate D. R.'s sports schedule. According to the GAL, the court should "protect[ ]" Lindsey's visitation time so that, when Lindsey planned activities that conflicted with D. R.'s sports schedule, she would be able to do so "without fear of reprisal from the [c]ourt."

Moreover, the GAL testified that, as a result of Reid's actions, several months had passed with little contact between D. R. and Lindsey. The GAL testified that she had repeatedly told Reid that, in her opinion, D. R. should be visiting Lindsey, and she reaffirmed that conclusion during the hearing, testifying that

17

it would be harmful to [D. R.], particularly based on his history with so many people having passed away in his life, significant people[,] and his life [had] been turned upside down by those things so many times, that it would be harmful for him to be just suddenly one day not have his grandparents anymore, that he saw them virtually every single day before that. Despite that, [D. R. and Lindsey] went months with no contact.

In addition, a parenting coordinator who had worked with the parties testified during the final hearing. In her opinion, there was a strong emotional bond between D. R. and Lindsey, and D. R.'s reluctance to having visitations with Lindsey was the result of his wanting to be with his friends and/or to participate in other activities, which she testified was "[t]ypical, adolescent kind of behavior." The parenting coordinator disagreed with the counselor's conclusion that visitation with Lindsey would be harmful to D. R. and, instead, testified that, in her opinion, denying D. R. any contact with Lindsey would be "traumatizing" to D. R. because of the extensive role Lindsey had in raising him and his history of losing members of his family.

The parenting coordinator also testified that having a set, predictable visitation schedule, where D. R. knew what to expect and what was planned, would be helpful to him and make visitations easier. She emphasized that, while the parties needed to remain flexible and needed to communicate with one another prior to making plans,

18

Lindsey's plans for her visitation periods should take precedence if there was a conflict. Moreover, the parenting coordinator cautioned that D. R. should not be allowed to dictate what activities he would be willing to participate in during scheduled visitations and that, even if D. R. was unhappy with the plans and wanted to do something else, Lindsey's decision should prevail as long as the plans were in D. R.'s best interests.

Therefore, it appears that, in reaching its conclusions in its final order, the trial court found that the counselor's testimony during the temporary hearing was not credible or determinative on the issue of whether visitation would be harmful to D. R. As a result, the court appears to have disregarded most of her testimony when making its decision and relied, instead, on the testimony of the GAL and parenting coordinator, as it was authorized to do.[20]

---

[20] See *Luke*, 280 Ga. App. at 611 (3) (OCGA § 19-7-3 "codifies a standard for the trial courts to utilize in balancing the interests of the child, the rights of the parents, and the wishes of an alienated grandparent. Where a petitioning grandparent meets this standard, a trial court may grant visitation — notwithstanding evidence or circumstances that weigh against a grant of visitation.") (footnotes omitted); see also *Keith*, 332 Ga. App. at 291-292 (It is the function of the trial court, not this Court, to weigh the evidence and determine witness credibility.); *River Walk Farm, L.P. v. First Citizens Bank & Trust Co.*, 321 Ga. App. 173, 177 (4) (741 SE2d 165) (2013) ("Georgia law has long held that the trier of fact may believe or disbelieve all or any part of the testimony of any witness.") (citation and punctuation omitted).

Consequently, after viewing the evidence in favor of the trial court's ruling,[21] especially the overwhelming evidence of Lindsey's significant parental care and support of D. R. throughout his childhood and the resulting emotional bond between them, we conclude that there was sufficient clear and convincing evidence presented to authorize the court's finding that D. R. would be harmed if visitation was not granted.[22]

(ii) *Whether visitation with Lindsey was in D. R.'s best interests*. Reid also contends that Lindsey failed to meet her burden of showing that visitation was in D. R.'s best interests, arguing that D. R. enjoyed his extracurricular activities and that visitation with Lindsey on weekends and during the summer would interfere with or even prevent his participation in such activities.[23]

As shown above, the trial court found that, given Lindsey's role in D. R.'s life and their "strong emotional bond," visitation with Lindsey was in D. R.'s best interests, but should occur on a regular schedule so D. R. would "know what to

---

[21] See *Keith*, 332 Ga. App. at 291.

[22] See *Luke,* 280 Ga. App. at 611-612 (3).

[23] See Division 2, infra, regarding the standard applied by the trial court when deciding how to resolve the conflicts between Lindsey's visitation and D. R.'s non-school-related extracurricular activities.

expect." Thus, after weighing the benefits of D. R.'s visitation with Lindsey versus his conflicting activities, the court outlined a specific visitation schedule in which it awarded Lindsey visitation for one weekend per month during the school year, but made that visitation subject to all of D. R.'s school-related extracurricular activities, while also giving Lindsey discretion as to whether D. R. participated in non-school-related activities that occurred during her visitation.[24] The court also awarded Lindsey two weeks of exclusive, uninterrupted visitation with D. R. during the summer, while also authorizing Lindsey to contact the leaders of any activities scheduled during that time to try to secure an excused absence for D. R. so he would not be penalized.

We find that, under the unique circumstances presented in this case, there was sufficient clear and convincing evidence to authorize the trial court to conclude that visitation with Lindsey, as detailed in its order, was in D. R.'s best interests.[25]

---

[24] In addition, the court ruled that Lindsey's visitation with D. R. "shall be exercised without the interference and/or presence of [ ] Reid and/or his immediate family[,]" although Reid and Lindsey would be allowed to attend any of D. R.'s sporting or school activities, ceremonies, and "other important events in the child's life" and could communicate with the child during those activities as long as it did not cause a "disruption."

[25] See *Luke*, 280 Ga. App. at 611-612 (3).

21

2. Reid contends that the trial court erred when it overrode the statutory mandate that grandparent visitation must be subject to the child's extracurricular activities. Specifically, Reid challenges the following ruling by the court:

> Upon assertion of his parental rights [in May 2016, when Reid moved D. R. out of Lindsey's home, Reid] enrolled the child in numerous sporting events that [were] time consuming and prevent[ed] exclusive time [between Lindsey and the] child. [Reid] placed the child in a recreational sports league. He also enrolled the child in multiple teams and activities related to these teams: Allstar baseball, travel ball, physical training, and private baseball skill evaluations. The net result[ ] of the multitude of activities [was that] almost all grandparent visitation time [was] spent at a ballpark for four (4) hours or longer [on] Saturday and Sunday. *This prevented any meaningful visitation [between Lindsey and D. R.]*. Further, Allstar and travel ball involve[d] tournaments, travel, practices, and fundraising that *prevent[ed] any meaningful summer visitation [with Lindsey]*.[26]

As discussed above, in a grandparent visitation case, OCGA § 19-7-3 (c) (1) allows the trial court to grant the grandparent "reasonable visitation rights if the court finds by clear and convincing evidence that the health or welfare of the child would be harmed unless such visitation is granted and if the best interests of the child would

---

[26] (Emphasis supplied.)

be served by such visitation." OCGA § 19-7-3 (c) (4) provides, however, that "[i]n no case shall the granting of visitation rights to a family member interfere with a child's *school or regularly scheduled extracurricular activities*."[27]

In this case, the trial court applied a standard dictionary definition to the term "extracurricular" and ruled that the term applied to school-related activities and teams, but not to activities that "are unrelated to schools[,] such as recreational league ball." The court also concluded that, when OCGA § 19-7-3 (c) (1) and OCGA § 19-7-3 (c) (4) are read in conjunction, the determination of which activities fall into the category of "regularly scheduled extracurricular activities" for a particular child is "subject to [the] best interest test." Applying this analysis to the instant case, the court ruled that

> [t]he best interest of [D. R.] requires that his bond with [Lindsey] be supported and continued. It is in [D. R.'s] best interest to have exclusive visitation with [Lindsey] that takes precedence over non-school[-]related activities scheduled by [his father, Reid]. [Reid], as the parent, will need to balance the scheduling of [such] activities as secondary to [Lindsey's] visitation as outlined in this Order.

---

[27] (Emphasis supplied.)

Thus, the court ruled that Lindsey's visitation with D. R. during the school year "shall be within her discretion as to [his] participation in non-school[-]related activities."[28] Reid argues that this ruling misconstrues and violates OCGA § 19-7-3 (c) (4).

In determining whether the trial court properly interpreted the statute at issue, we apply a de novo standard of review.[29]

> [T]he cardinal rule in construing a legislative act . . . is to ascertain the legislative intent and purpose in enacting the law, and then to give it that construction which will effectuate that intent and purpose. A court is usually able to determine legislative intent by reading the statute literally — i.e., by affording the language used its plain and ordinary meaning.[30]

That being said, statutes must be construed "in accordance with their real intent and meaning[, but] not so strictly as to defeat their legislative purpose, and statutory construction must square with common sense and sound reasoning."[31]

---

[28] As noted in Division 1 (b), supra, for school-related extracurricular activities during the school year, Lindsey's visitation would not be exclusive and she would be responsible for taking D. R. to the activities during her visitation period.

[29] See *State of Ga. v. Free At Last Bail Bonds*, 285 Ga. App. 734 (647 SE2d 402) (2007).

[30] Id. at 736 (citations and punctuation omitted); see also OCGA § 1-3-1 (a), (b).

[31] *City of Atlanta v. Miller*, 256 Ga. App. 819, 820 (1) (569 SE2d 907) (2002) (citations and punctuation omitted).

In this case, construing the term "extracurricular" in OCGA § 19-7-3 (c) (4) to encompass every possible activity in which D. R. could participate, as Reid appears to argue, would allow Reid to schedule so many "extracurricular" activities for D. R. that the court's grant of visitation to Lindsey would be vitiated. This Court must avoid such a contradictory and absurd result by trying "to make sense out of the statute, while being faithful to the legislative intent."[32] Moreover, because there is a "presumption that the legislature did not intend to enact meaningless language[,]" this Court must "interpret the statute as a whole, striving to make all its parts harmonize and to give a sensible and intelligent effect to each part, and to avoid constructions that make some language mere surplusage."[33]

Viewing OCGA § 19-7-3 in that light, we find that subsections (c) (1) and/or (c) (3) would be rendered meaningless if, after a trial court awarded visitation to a child's grandparent under those provisions, subsection (c) (4) allowed the child's parent to undermine such visitation through the scheduling of activities for the child that would frequently overlap with and overwhelm the visitation ordered.

---

[32] *Free At Last Bail Bonds*, 285 Ga. App. at 736 (citations and punctuation omitted).

[33] Id. at 737 (citations and punctuation omitted).

25

Consequently, we find no error in the trial court's conclusion that, under OCGA § 19-7-3 (c) (4), a court is authorized to find that giving a grandparent's visitation priority over non-school-related extracurricular activities is in the child's best interests.

3. Reid contends that the trial court erred when it ordered him to pay 50 percent of the GAL's fees, arguing that the order violated OCGA § 19-7-3 (e) (1). Under OCGA § 19-7-3 (e) (1), "[i]f the court finds that the family member can bear the cost without unreasonable financial hardship, the court, *at the sole expense of the petitioning family member*, may [a]ppoint a guardian ad litem for the minor child[.]"[34]

The record shows that, in August 2016, shortly after Lindsey filed her custody petition, the parties entered into a consent order wherein the court appointed a GAL and required Lindsey to pay the GAL's "initial retainer and future fees *subject to reallocation*[.]"[35] The consent order also specifically stated that "[t]he Court retain[ed] jurisdiction over any and all [of the GAL's] fees and expenses until final settlement or trial and *may reapportion any and all costs at that time as the Court*

_____

[34] (Emphasis supplied.)

[35] (Emphasis supplied.)

26

*deems just and proper.*"[36] Reid's counsel consented to this order on Reid's behalf at the time it was issued and, after it was issued, Reid never objected or withdrew his consent to the possibility that the court would order him to pay a portion of the GAL's fees.

Subsequently, in the final order, the court cited to the "Consent Order appointing a [GAL] and agreeing to a reapportionment of fees in the Court's discretion." Based upon that agreement by the parties, the court exercised its discretion and ordered Reid "to remit fifty percent (50%) of the [GAL] fees directly to [Lindsey] within six (6) months of the entry of this Order."

A "consent order constitutes a binding agreement between the parties with regard to their respective rights and obligations. . . . Both parties signed the [consent order], and the [order] became a binding contract between the parties. Competent parties are free to choose, insert, and agree to whatever provisions they desire in a contract *unless prohibited by statute* or public policy."[37]

---

[36] (Emphasis supplied.)

[37] *State Farm Fire & Cas. Ins. Co. v. Terry*, 230 Ga. App. 12, 14 (2) (495 SE2d 66) (1997) (citation and punctuation omitted; emphasis supplied).

However, OCGA § 19-7-3 (e) (1) "plainly provides that if a guardian ad litem is appointed in a grandparent visitation case such as this one, then it shall be at the sole expense of the petitioning grandparent. Nothing in the statute contemplates holding the defendant parent liable for the expense of a court-appointed guardian ad litem."[38] Therefore, we conclude that the provision of the consent order at issue is prohibited by statute and cannot be used to justify the trial court's order requiring Reid to pay half of the GAL's fees.[39] Thus, that ruling is reversed.[40]

*Judgment affirmed in part and reversed in part. Barnes, P. J., concurs. McMillian, J., concurs in judgment only.**

**\*THIS OPINION IS PHYSICAL PRECEDENT ONLY. COURT OF APPEALS RULE 33.2 (a)**

---

[38] *Beloate v. Peden*, 328 Ga. App. 64, 68-69 (2) (761 SE2d 487) (2014).

[39] See *State Farm Fire & Cas. Ins. Co.*, 230 Ga. App. at 14 (2).

[40] See *Beloate*, 328 Ga. App. at 69 (2).